894 A.2d 1241 (2006)
384 N.J. Super. 451
In the Matter of STORMWATER MANAGEMENT RULES.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 2006.
Decided April 12, 2006.
*1242 Paul H. Schneider argued the cause for appellant, New Jersey Builders Association (Giordano, Halleran & Ciesla, attorneys; Michael J. Gross, of counsel; Mr. Schneider and Steven M. Dalton, Middletown, on the brief).
John A. Covino, Deputy Attorney General, argued the cause for respondent, New Jersey Department of Environmental Protection (Zulima V. Farber, Attorney General of New Jersey, attorney; Michael J. Schuit, Deputy Attorney General, and Mr. Covino, on the brief).
Carter H. Strickland of Rutgers Environmental Law Clinic, attorneys for amici curiae, American Littoral Society, Association of New Jersey Environmental Commissions, Delaware Riverkeeper Network, Delaware Riverkeeper, Hackensack Riverkeeper, New Jersey Audubon Society, New Jersey Conservation Foundation, New Jersey Conservation Foundation, New Jersey Environmental Federation, New Jersey Public Interest Research Group, Raritan Baykeeper, Inc. (d/b/a New York/New Jersey Baykeeper), and Sierra Club-New Jersey (Carole L. Hendrick of the Pennsylvania bar, admitted pro hac vice, of counsel; Mr. Strickland, on the brief).
Before Judges LINTNER, PARRILLO and HOLSTON, JR.
The opinion of the court was delivered by
PARRILLO, J.A.D.
At issue is the validity of a regulation, N.J.A.C. 7:8-5. 5(h), adopted by the New Jersey Department of Environmental Protection (DEP) on February 2, 2004, as part of a comprehensive scheme governing stormwater management, N.J.A.C. 7:8-1.1 to -6.3, inclusive, and repealing then existing stormwater management rules. The challenged regulation creates a 300-foot buffer on each side of water bodies designated as "Category 1" waters and their associated perennial or intermittent streams. N.J.A.C. 7:8-5.5(h). Appellant, New Jersey Builders Association, contends that this provision falls outside the scope of the DEP's statutorily delegated authority and is ultra vires on its face.
To better understand the argument, we provide the larger statutory and regulatory context against which the challenged provision must be considered. In 1981, the Legislature amended the Municipal Land Use Law (MLUL) by adding Article 13, N.J.S.A. 40:55D-93 to -99, the Stormwater Management Act (SMA or the Act). L. 1981, c. 32. The Act delegates to the DEP "the authority to regulate storm water management." N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 310 N.J.Super. 224, 240, 708 A.2d 708 (App.Div.1998), aff'd, 158 N.J. 211, 729 A.2d 21 (1999). Stormwater is "water resulting from precipitation (including rain and snow) that runs off the land's surface...." N.J.A.C. 7:8-1.2. "Stormwater runoff" is "water flow on the surface of the ground or in storm sewers, resulting from precipitation." Ibid. It is well documented that stormwater runoff picks up pollutants from the land surface and creates problems for the quality and quantity of water in New Jersey. Thus, one of the primary objectives of the SMA is "to prevent, to the greatest extent feasible, an increase in nonpoint pollution." N.J.S.A. 49:55D-95. *1243 This goal is accomplished through "stormwater management measure[s]", defined as "any structural or nonstructural" methods intended, among other things, "to control or reduce stormwater runoff and associated pollutants...." N.J.A.C. 7:8-1.2.
Under the Act, every municipality in the State must prepare a stormwater management plan and an implementing stormwater control ordinance, N.J.S.A. 40:55D-93, in accordance with "comprehensive storm water management regulations by the Commissioner of the [DEP]...." Ibid. The required components of the plan and ordinance are set forth in N.J.S.A. 40:55D-95 and:
shall conform to all relevant Federal and State statutes, rules and regulations concerning storm water management or flood control and shall be designed: a. to reduce flood damage, including damage to life and property; b. to minimize storm water runoff from any new land development where such runoff will increase flood damage; c. to reduce soil erosion from any development or construction project; d. to assure the adequacy of existing and proposed culverts and bridges; e. to induce water recharge into the ground where practical; f. to prevent, to the greatest extent feasible, an increase in nonpoint pollution; g. to maintain the integrity of stream channels for their biological functions, as well as for drainage; and h. to minimize public safety hazards at any storm water detention facilities constructed as part of a subdivision or pursuant to a site plan. A storm water management plan shall also include such structural changes and such additional nonstructural measures and practices as may be necessary to manage storm water. For purposes of this act "nonpoint pollution" means pollution from any source other than from any discernible, confined and discrete conveyance, and shall include, but not be limited to, pollutants from agricultural, silvicultural, mining, construction, subsurface disposal and urban runoff sources.
[N.J.S.A. 40:55D-95.]
The DEP adopted its first set of regulations implementing the Act, N.J.A.C. 7:8, in 1983. 15 N.J.R. 142-45 (Feb. 7, 1983). These regulations "establish[ed] minimum requirements and controls to compensate for the differences in the hydrologic response of the watershed from the undeveloped to the developed condition." N.J.A.C. 7:8-1.1 (1983). They were readopted over the years without change until 2004, when, in its first major update in twenty years, reflecting a decade of study, the DEP promulgated new stormwater management regulations after holding three public hearings and receiving comments from more than 1200 respondents. 36 N.J.R. 670, 670-76 (Feb. 2, 2004); 36 N.J.R. 781, 781-82 (Feb. 2, 2004).
The newly adopted regulations establish requirements for stormwater planning at the municipal, county and regional levels. The stated goals mirror practically word-for-word those expressed in N.J.S.A. 40:55D-98 and range from flood, erosion and pollution control to maintaining the integrity of waterways for their biological functions. N.J.A.C. 7:8-2.2(a). One such objective is to:
Minimize pollutants in stormwater runoff from new and existing development in order to restore, enhance and maintain the chemical, physical, and biological integrity of the waters of the State, to protect to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water ...
[N.J.A.C. 7:8-2.2(a).]
*1244 Save for a few exceptions listed in N.J.A.C. 7:8-1.6(b), the stormwater regulations apply to "all major development," N.J.A.C. 7:8-1.6(a).
"Development" means the division of a parcel of land into two or more parcels, the construction, reconstruction, conversion, structural alteration, relocation or enlargement of any building or structure, any mining excavation or landfill, and any use or change in the use of any building or other structure, or land or extension of use of land, for which permission is required under the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq.
[N.J.A.C. 7:8-1.2.]
And "[m]ajor development" means any new or expanded development that proposes "disturbing one or more acres of land or increasing impervious surface by one-quarter acre or more." Ibid. "Disturbance" is defined as "the placement of impervious surface or exposure and/or movement of soil or bedrock or clearing, cutting, or removing of vegetation." Ibid.
The regulations
establish[ ] general requirements for stormwater management plans and stormwater control ordinances, as well as content requirements and procedures for the adoption and implementation of regional [and municipal] stormwater management plans ... under the [MLUL]; the Water Quality Planning Act [WQPA], N.J.S.A. 58:11A-1 [to -16]; the Water Pollution Control Act [WPCA], N.J.S.A. 58:10A-1 [to -35]; and the Flood Hazard Area Control Act [FHACA], N.J.S.A. 58:16A-50 [to -101].
[N.J.A.C. 7:8-1.1(a).]
More specifically, for present purposes, the regulations
establish[ ] design and performance standards for [those] stormwater management measures required by [other legislative schemes, such as] the [FHACA]...; the Coastal Area Facility Review Act [CAFRA], N.J.S.A. 13:19-1 [to -33]; the Wetlands Act of 1970, N.J.S.A. 13:9A-1 [to -10]; the Waterfront Development Law [WDA], N.J.S.A. 12:5-3 [to -11]; the Freshwater Wetlands Protection Act [FWPA], N.J.S.A. 13:9B-1 [to -30]; and the Dam Safety Act, N.J.S.A. 58:4-1 [to -14].
[N.J.A.C. 7:8-1.1(b).]
These standards affect: (1) flood control, that is, "erosion control, ... groundwater recharge, and ... stormwater runoff quantity", N.J.A.C. 7:8-5.4(a); and (2) pollution control, that is, "[s]tormwater runoff quality." N.J.A.C. 5.5. They are designed "to minimize the adverse impact of stormwater runoff on water quality and water quantity and [on the] loss of groundwater [mediation] in receiving water bodies." N.J.A.C. 7:8-5.1(a).
The regulatory scheme also makes clear that "[t]o the maximum extent practicable, the[se] standards ... shall be met by incorporating nonstructural stormwater management strategies ... into the design" of any project. N.J.A.C. 7:8-5.3(a). That is, a permit applicant[1] must identify the non-structural strategies incorporated into the project's design, including, but not limited to, minimizing disturbance, minimizing impervious surfaces, minimizing the use of stormwater pipes, preserving natural drainage features, and increasing natural vegetation. N.J.A.C. 7:8-5.3(b). Guidance for these strategies can *1245 be found in the New Jersey Stormwater Best Management Practices Manual 2002 (BMP manual).
N.J.A.C. 7:8-5.5 contains the minimum design and performance standards regulating stormwater runoff quality, that is, nonpoint-source pollution control. This provision requires that sites must be designed with "[s]tormwater management measures" that: (1) reduce the overall nutrient load in the stormwater runoff from the developed site "to the maximum extent feasible," N.J.A.C. 7:8-5.5(e); and (2) "reduce the post-construction load of total suspended solids (TSS) in stormwater runoff... by [at least] 80% of the anticipated load from the developed site," and in some instances, by 95% or more. N.J.A.C. 7:8-5.5(a), (g) and (h)(3)(ii).
N.J.A.C. 7:8-5.5 also expressly recognizes two sensitive waterbodies and requires increased safeguards in those areas. First, extra stormwater-runoff protections are required for all "waters classified as `FW1'" under the State's surface-water quality standards, as defined in N.J.A.C. 7:9B-1.4. N.J.A.C. 7:8-5.5(g).
"FW1" means those fresh waters, as designated in N.J.A.C. 7:9B-1.15(h) Table 6, that are to be maintained in their natural state of quality (set aside for posterity) and not subjected to any man-made wastewater discharges or increases in runoff from anthropogenic activities. These waters are set aside for posterity because of their clarity, color, scenic setting, other characteristic of aesthetic value, unique ecological significance, exceptional recreational significance, exceptional water supply significance, or exceptional fisheries resource(s).
[N.J.A.C. 7:9B-1.4.]
According to N.J.A.C. 7:8-5.5(g), construction projects designed in FW1 areas "shall be designed to prevent any increase in stormwater runoff ...." (emphasis added).
At issue here, however, is the extra stormwater-runoff protection required for the other category of waterbody classified by the DEP as "Category One" (C1) in N.J.A.C. 7:9B and for those "perennial or intermittent streams that drain into or upstream of the Category One waters...." N.J.A.C. 7:8-5.5(h).
"Category one waters" means those waters designated in the tables in N.J.A.C. 7:9B-1.15(c) through (h), for purposes of implementing the antidegradation policies set forth at N.J.A.C. 7:9B-1.5(d), for protection from measurable changes in water quality characteristics because of their clarity, color, scenic setting, other characteristics of aesthetic value, exceptional ecological significance, exceptional recreational significance, exceptional water supply significance, or exceptional fisheries resource(s).[2]

*1246 [N.J.A.C. 7:9B-1.4 (emphasis added).]
The exceptional characteristics of C1 waters thus require special protection. Unlike "FW1" waters, which are deserving of the greatest protection, discharges are allowed in C1 waters but they cannot result in "any measurable changes (including calculable or predicted changes) to the existing water quality." N.J.A.C. 7:9B-1.5(d)(6)(iii).
The specific regulatory measure at issue here is contained in N.J.A.C. 7:8-5.5(h), which establishes "[s]pecial water resource protection areas" along these C1 waters and their associated "perennial or intermittent streams." Projects designed near C1 waters and their tributaries must have "[a] 300-foot special water resource protection area" on each side of the waterway "consisting of existing vegetation or vegetation allowed to follow natural succession...." N.J.A.C. 7:8-5.5(h)(1)(i) (emphasis added).[3] These 300-foot buffers or "vegetation zones" are "established for the protection of water quality, aesthetic value, exceptional ecological significance, exceptional recreational significance, exceptional water supply significance, and exceptional fisheries significance of those established Category One waters." N.J.A.C. 7:8-5.5(h). As the DEP has declared:
The goal of the special water resource protection area is to maintain and/or create an unbroken, undisturbed vegetated buffer to meet these purposes and to prevent water quality degradation, along all Category One waters and all waters flowing into them within the same HUC 14 watershed area.
[36 N.J.R. at 748.]
During the approval process, substantial data and scientific evidence was adduced in support of the DEP's determination that the creation of 300-foot buffers was the appropriate level of protection for C1 water bodies. The detrimental effects of stormwater runoff from land development were well documented in the record as was the need to use buffers to protect sensitive waterways. Based on the available literature and studies, the DEP concluded:
that the 300-foot special water resource protection area is the best and most reliable means to prevent the degradation of surface water quality from nonpoint source pollution and protect the chemical, physical and biological integrity of the State's surface waters.
[36 N.J.R. at 742.]
It is important to first identify what is not in issue in this case. Appellant does not contest the basic proposition that the DEP has the statutory authority to regulate municipal and regional stormwater management planning, establish safety standards for stormwater detention basins, promote groundwater recharge, and prevent flooding and protect water quality by requiring that any development will control the quantity and quality of stormwater. Nor does appellant question the *1247 DEP's authority to classify the State's waterways according to their level of ecological and environmental sensitivity; or to establish standards that vary according to the nature and classification of the waterways into which stormwater flows and passes; or to impose the more stringent standards in N.J.A.C. 7:8-5.5(g) for waters classified as FW1; or, most significantly for present purposes, to impose other stringent controls on stormwater flowing into "C1" waterways and their tributaries in order to protect the quality of those waters.
Rather, appellant's claim is based on the contention that there is no statutory enabling authority for these 300-foot buffers which, appellant argues, function as "no build" provisions directly regulating the use of land without regard to stormwater control or management and promulgated by the DEP without state-wide land-use regulatory jurisdiction. Although residual power over land use has been delegated to the municipalities under the MLUL, appellant's argument overlooks the close correlation between riparian land use and water quality, over which the DEP does exercise plenary power. Thus, the authority to support the DEP's use of buffers to prevent nonpoint source pollution, 36 N.J.R. 750, is to be found first in the enabling statute, N.J.S.A. 13:1D-1 to -19, which creates the DEP and accords it broad powers of conservation and ecological control, and second in the mix of legislative schemes that seek to promote water quality and prevent water pollution.
It is well-settled that the statutory grant of power by the Legislature to an agency can either be express or implied. N.J. Dep't of Labor v. Pepsi-Cola Co., 170 N.J. 59, 61, 784 A.2d 64 (2001); N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978). In determining whether the requisite authority is implied, if not expressed, a court will "consider not only the particular statute in question, but also the entire legislative scheme of which it is a part." Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129, 527 A.2d 1368 (1987). "`[E]very effort should be made to harmonize the law relating to the same subject matter.'" In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 469, 608 A.2d 288 (1992) (quoting Superior Air Prods. Co. v. NL Indus., Inc., 216 N.J.Super. 46, 63-64, 522 A.2d 1025 (App.Div.1987)). In other words, in deciding whether a particular regulation is statutorily authorized, a "court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." N.J. Guild, supra, 75 N.J. at 562, 384 A.2d 795. Accord E.I. du Pont de Nemours & Co. v. State of N.J., Dep't of Envtl. Prot. & Energy, 283 N.J.Super. 331, 340, 661 A.2d 1314 (App.Div.1995). In this manner, "courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." N.J. Guild, supra, 75 N.J. at 562, 384 A.2d 795. That is because "the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities." Ibid. In fact,
the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation.
[In re N.J. Bd. of Pub. Utils., 200 N.J.Super. 544, 557, 491 A.2d 1295 (App. Div.1985).]
At issue in Soc'y for Envtl. Econ. Dev. v. N.J. Dep't of Envtl. Prot., 208 N.J.Super. *1248 1, 504 A.2d 1180 (App.Div.1985), were the DEP's comprehensive regulations governing development in freshwater flood hazard areas, challenged as ultra vires. We rejected the argument, declaring that:
The broad scope of environmental concerns expressed by the Legislature in its various enactments and the totality of powers accorded by the Legislature to DEP to enable it to address those concerns persuades us that DEP has ample power to deal comprehensively in a single set of regulations with the overlapping areas of flood hazards, water pollution, and preservation of plant and animal life dependent upon the streams being encroached upon.
[Id. at 8, 504 A.2d 1180.]
Similarly, in Lom-Ran Corp. v. Dep't of Envtl. Prot., 163 N.J.Super. 376, 385, 394 A.2d 1233 (App.Div.1978), we determined that the DEP has a duty to prevent pollution and is provided wide latitude in protecting public health by controlling pollution.
So construed, we are satisfied that N.J.A.C. 7:8-5(h) falls within the scope of the DEP's statutorily delegated authority. The Legislature, in a variety of measures, has given the DEP a wide array of power to address water quality and pollution concerns beyond traditional floodwater control, and to promulgate rules to protect the waters of this State. We read these statutory schemes, of course, in pari materia. Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15, 878 A.2d 829 (2005) ("`[s]tatutes that deal with the same matter or subject should be read in pari materia....'") (quoting In re Adoption of a Child by W.P. & M.P., 163 N.J. 158, 182-83, 748 A.2d 515 (2000)).
First, N.J.S.A. 13:1D-9, part of the DEP's general enabling statute, directs the agency to "formulate comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State." (Emphasis added). Comprehensive policies encompass "not only end-point objectives but also the means that should be used to attain those ends. U.S. Sportsmen's Alliance Found. v. N.J. Dep't of Envtl. Prot., 182 N.J. 461, 477-78, 867 A.2d 1147 (2005). For purposes here relevant, the DEP has been specifically authorized to enact "comprehensive storm water management regulations[,]" N.J.S.A. 40:55D-93, and by virtue of the more general grant, is empowered to "[e]nforce the State ... water pollution, conservation [and] environmental protection ... laws, rules and regulations ...." N.J.S.A. 13:1D-9(n).
Beyond the enabling legislation, the New Jersey Water Pollution Control Act (WPCA), N.J.S.A. 58:10A-1 to -35, referred to by N.J.S.A. 13:1D-9(n), states as legislative findings:
that pollution of the ground and surface waters of this State continues to endanger public health; to threaten fish and aquatic life, scenic and ecological values; and to limit the domestic, municipal, recreational, industrial, agricultural and other uses of water....
[N.J.S.A. 58:10A-2.]
As such, the WPCA empowers the DEP to promulgate "regulations to prevent, control or abate water pollution," N.J.S.A. 58:10A-4, "to adopt surface water quality standards, and to implement control programs that can achieve and/or maintain the designated uses of New Jersey's waters...." 36 N.J.R. at 741-42.
The objective of the Water Quality Planning Act (WQPA), N.J.S.A. 58:11A-1 to - 16, "is, wherever attainable, to restore and maintain the chemical, physical and biological integrity of the waters of the *1249 State...." N.J.S.A. 58:11A-2. The WQPA also directs that all area wide plans "establish[ ] ... a regulatory program ... to provide control or treatment of all point and nonpoint sources of pollution...." N.J.S.A. 58:11A-5(c)(1). And, as previously noted, the Stormwater Management Act, N.J.S.A. 40:55D-93 to -99, which is part of the MLUL, vests the DEP with the authority to promulgate comprehensive stormwater management regulations without regard to geographic limits, N.J.S.A. 40:55D-93, and "to develop a water runoff plan for the entire State." Statement of the Senate Natural Resources & Agricultural Committee on L. 1981, c. 21. Indeed, the MLUL recognizes the high correlation between land use and stormwater when it directs stormwater management plans "to minimize storm water runoff from any new land development where such runoff will increase flood damage [and] to reduce soil erosion from any development or construction project." N.J.S.A. 40:55D-95.
The broad scope of water quality and pollution concerns voiced by the Legislature in these various enactments and the totality of powers vested in the DEP to enable it to address these concerns persuade us that the agency has ample authority to create protective buffers around "C1" waters and their tributaries. The fact that other statutory enactments, such as the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30; the Coastal Area Facility Review Act (CAF-RA), N.J.S.A. 13:19-1 to -21; the Flood Area Control Act, N.J.A.C. 7:13-1.1 to -1.7; the Delaware & Raritan Canal Park Act, N.J.S.A. 13:13A-1 to -15; the Pinelands Protection Act, N.J.S.A. 13:18A-1 to -29; and the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1 to -35, have expressly granted DEP authority to plan land development, or clearly delineate precise areas within which DEP may regulate, or specifically mandate discrete buffers, see, e.g., Am. Cyanamid Co. v. State Dep't of Envtl. Prot., 231 N.J.Super. 292, 555 A.2d 684 (App.Div.), certif. denied, 117 N.J. 89, 563 A.2d 847 (1989); Deskovick v. Water Policy & Supply Council, 157 N.J.Super. 89, 384 A.2d 554 (App.Div.), certif. granted, 77 N.J. 482, 391 A.2d 497, certif. dismissed, 78 N.J. 410, 396 A.2d 597 (1978), does not negate the agency's authority in the limited instance involving C1 waters to establish a regulatory safety buffer. In N.J. Builders Ass'n v. Dep't of Envtl. Prot., 169 N.J.Super. 76, 404 A.2d 320 (App.Div.), certif. denied, 81 N.J. 402, 408 A.2d 796 (1979), the appellant argued that DEP lacked express statutory authority to establish water quality standards in the Pinelands and to designate certain lands within the Pinelands as a "critical area" for sewerage purposes. Id. at 81-82, 404 A.2d 320. We disagreed. Id. at 90, 404 A.2d 320. We analyzed the Water Pollution Control Act, the Water Quality Planning Act and the Safe Water Drinking Act, finding that:
[a]ll of the acts seek to prevent the degradation of water quality and to preserve the environment. All of the acts give the DEP Commissioner the power to protect ground water and surface water. All of the acts seek to lessen the impact of pollution from point sources and nonpoint sources. Undoubtedly, given the breadth of the legislation, its goal to promote public health and welfare through preservation of water quality and the environment, any question about the jurisdiction of the DEP Commissioner presumptively should be resolved in his favor.
[Id. at 85-86, 404 A.2d 320.]
And, the DEP's power to adopt protective buffers was recently confirmed in the Highlands Water Protection & Planning Act, wherein the Legislature adopted 300-foot *1250 buffers around all open waters in the Highlands area and stated that those buffers:
shall not be construed to limit any authority of the department to establish buffers of any size or any other protections for category one waters designated by the department pursuant to the "Water Pollution Control Act," . . . or any other law, or any rule or regulation adopted pursuant thereto, for major Highlands development or for other development that does not qualify as major Highlands development.
[N.J.S.A. 13:20-32(a) (emphasis added).]
We, therefore, conclude that N.J.A.C. 7:8-5.5(h) is not ultra vires.
A secondary contention, not advanced at oral argument, is that the regulation is unreasonable and, therefore, invalid. However, "regulations which fall within the scope of the statutorily delegated authority and are not ultra vires on their face," are presumed to be valid. Soc'y for Envt'l Econ. Dev., supra, 208 N.J.Super. at 4, 504 A.2d 1180; see also N.J. State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21; In re Adoption of Amendments to N.J.A.C. 5:93-1.3 and 5:93-5.3, 339 N.J.Super. 371, 383, 772 A.2d 9 (App.Div.2001). The party challenging such action has the burden of overcoming that strong presumption. Med. Soc'y of N.J. v. N.J. Dep't of Law & Pub. Safety, 120 N.J. 18, 25, 575 A.2d 1348 (1990).
Moreover, "courts ordinarily recognize that an agency's specialized expertise renders it particularly well-equipped to understand the issues and enact the appropriate regulations pertaining to the technical matters within its area." In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 330, 807 A.2d 198 (App.Div.2002); see also N.J. State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21. "`If there is any fair argument in support ... [of the agency's action, it] will not be disturbed unless patently corrupt, arbitrary or illegal.'" N.J. Guild, supra, 75 N.J. at 563, 384 A.2d 795 (quoting Flanagan v. Dep't of Civil Serv., 29 N.J. 1, 12, 148 A.2d 14 (1959)).
So tested, we conclude that the challenged provision meets the criteria of validity. As already noted, our review of the record satisfies us that there was an adequate factual basis to support creation of the 300-foot buffers, and appellant contests neither the technical and scientific justification for such protective measures nor the need for some regulation in the area. Indeed, a clear nexus exists between N.J.A.C. 7:8-5.5(h) and a legitimate environmental objective. And in determining whether the means used to attain the statutory goals are reasonable, we, of course, defer to the judgment of the DEP that buffers provide "the best available and most reliable methods [both] to prevent degradation [of] Category One waters from ... nonpoint source pollution", 36 N.J.R. at 745, and "to prevent new point source discharges of stormwater to the waterway in order to preserve the existing aesthetic and ecological values of the area." 35 N.J.R. 119, 136-38 (Jan. 6, 2003). See 36 N.J.R. at 807-09.
We reject as well appellant's related contention that because DEP's buffer requirement applies regardless of whether stormwater runoff will ever flow into C1 waterways, it is therefore unrelated to stormwater management. No one disputes that development in close proximity to C1 waters can have a deleterious effect on these waters whether or not stormwater is discharged directly to the stream. On this score, the full intent of the buffer is to preserve the attributes and uses for which these waters were designated as C1. *1251 As such, the DEP may impose a buffer to avoid development-related impacts on water quality unrelated to stormwater, 36 N.J.R. 750, or for reasons altogether unrelated to protecting water quality, such as, for instance, recreation and aesthetics. In any event, aesthetics is a component of water quality. "Aesthetic satisfaction" is one of the elements of the public interest in the "restoration, maintenance and preservation of the quality of the waters of the State." N.J.S.A. 58:11A-2. Furthermore, aesthetic characteristics are part of the definition of "C1" waters, N.J.A.C. 7:9B-1.4, and are a part of the goals of stormwater management planning. N.J.A.C. 7:8-2.2(a)(8).
The validity of N.J.A.C. 7:8-5.5(h), as promulgated, is affirmed.
NOTES
[1] Implementation of these specific measures is through the existing MLUL approval and permitting process and through the permitting processes in DEP's Land Use Regulation Program (for example, stream encroachment permits, waterfront development permits, freshwater wetlands permits and CAFRA permits). 36 N.J.R. at 788.
[2] These waters may include, but are not limited to:

1. Waters originating wholly within Federal, interstate, State, county, or municipal parks, forests, fish and wildlife lands, and other special holdings that have not been designated as FW1 at N.J.A.C. 7:9B-1.15(h) Table 6;
2. Waters classified at N.J.A.C. 7:9B-1.15(c) through (g) as FW2 trout production waters and their tributaries;
3. Surface waters classified in this subchapter as FW2 trout maintenance or FW2 nontrout that are upstream of waters classified in this subchapter as FW2 trout production;
4. Shellfish waters of exceptional resource value; or
5. Other waters and their tributaries that flow through, or border, Federal, State, county, or municipal parks, forests, fish and wildlife lands, and other special holdings.
[N.J.A.C. 7:9B-1.4.]
[3] Appellant mischaracterizes these buffers as "no build zones." The regulation allows existing homes, sheds and other accessory buildings within the buffer areas. The regulation also carves out three limited circumstances when the 300-foot buffer may be reduced to not less than 150 feet on both sides of the water body, in which case additional conditions must be met to ensure that the functional value and overall condition of the special water resource protection area will be maintained or enhanced "to the maximum extent practicable." N.J.A.C. 7:8-5.5(h)(1)(ii); see N.J.A.C. 7:8-5.5(h)(3); and N.J.A.C. 7:8-5.5(h)(4). Moreover, the special water resource protection measures of N.J.A.C. 7:8-5.5(h) do "not apply to the construction of one individual single family dwelling that is not part of a larger development on a lot receiving preliminary or final subdivision approval on or before February 2, 2004, provided that the construction begins on or before February 2, 2009." N.J.A.C. 7:8-5.5(h)(5).