**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0285-23

IN RE JOHNSON DEVELOPMENT
ASSOC. INC., PI 1112-04-0011.1,
LUP220003.

_____

Argued February 12, 2025 – Decided March 12, 2025

Before Judges Mayer, Rose and DeAlmeida.

On appeal from the New Jersey Department of Environmental Protection.

C. Michael Gan argued the cause for appellant The Alliance for Sustainable Communities (Lieberman Blecher & Sinkevich, PC, attorneys; Stuart J. Lieberman, of counsel and on the briefs; C. Michael Gan, on the briefs).

Niall J. O'Brien argued the cause for respondent Johnson Development Associates, Inc. (Archer & Greiner, PC, attorneys; Robert W. Bucknam, Jr., of counsel and on the brief; Niall J. O'Brien and Jamie A. Slimm, on the brief).

Jason T. Stypinski, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa,

Assistant Attorney General, of counsel; Jason T. Stypinski, Deputy Attorney General, on the brief).

PER CURIAM

Appellant The Alliance for Sustainable Communities (Alliance) appeals an August 14, 2023 flood hazard permit issued by respondent New Jersey Department of Environmental Protection (NJDEP) to co-respondent Johnson Development Associates, Inc. (Johnson). We affirm.

Johnson sought to construct two warehouse buildings with parking, access roads, and stormwater management facilities (Project) at property located in Robbinsville Township (Property). The Property, consisting of ninety acres of land, is partially developed with an existing office building, loop road, and two stormwater management basins. These features were constructed pursuant to a prior development approval for the Property. Additionally, the Property has several unnamed tributaries feeding into the Indian Run Creek.

Because demand for new office space decreased, Johnson applied for a use variance to construct the proposed warehouses.[1] The Robbinsville Township

---

[1] The Property's history and variance approval are detailed in Alliance for Sustainable Communities v. Robbinsville Twp. Zoning Bd., No. A-2509-21 (App. Div. July 25, 2024).

A-0285-23

Zoning Board (Board) granted a use variance, allowing Johnson to construct the warehouses. We upheld the Board's approval of the use variance.

The Project is subject to flood hazard and stormwater review by NJDEP. Specifically, the Project required a Flood Hazard Area Verification and Flood Hazard Area Individual Permit (Permit) under the Flood Hazard Area Control Act (FHACA), N.J.S.A. 58:16A-50 to -103, and the Flood Hazard Area Control Act Rules (Rules), N.J.A.C. 7:13-1 to -24.11.

NJDEP issued a February 18, 2021 Letter of Interpretation (LOI) defining the limits of wetlands on the Property. The LOI classified the Property's existing wetlands as having either ordinary or intermediate resource value.[2]

On June 2, 2022, Langan Engineering and Environmental Services, Inc. (Langan), on Johnson's behalf, filed a Permit application with NJDEP. Two weeks later, Alliance wrote to NJDEP objecting to the application and requesting NJDEP rescind its LOI categorizing the wetlands on the Property. Alliance included an engineering report from Princeton Hydro with its objection letter. According to Alliance, the existing large retaining pond on the Property

---

[2] Under the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, there are three classifications of wetlands: exceptional resource value, intermediate resource value, and ordinary resource value. N.J.S.A. 13:9B-7. The statute defines the characteristics associated with each classification of wetlands.

was misclassified as a wet detention basin and two of the wetlands delineated as having ordinary resource value according to the LOI should have been designated as wetlands having intermediate resource value. Alliance also claimed various wildlife inhabited the Property, specifically the bald eagle, qualifying the surrounding wetlands as a habitat for threatened or endangered species.

In its report, Princeton Hydro challenged the sufficiency of the stormwater management controls on the Property. The report also characterized the Property's wetlands as a critical habitat for the bald eagle and other wildlife.

The FHACA authorizes NJDEP to "adopt land use regulations for the flood hazard area, to control stream encroachments," and "to integrate the flood control activities of the municipal, county, State and Federal Governments." N.J.S.A. 58:16A-50. Pursuant to that authority, NJDEP promulgated the Rules, which are rules and regulations for obtaining construction permits in flood hazard areas and within, along, or around regulated waters. See N.J.A.C. 7:13-1 to -24.11.

Additionally, NJDEP is delegated "the authority to regulate storm water management" under the Storm Water Management Act (SMA), N.J.S.A. 40:55D-93 to -99. In re Stormwater Mgmt. Rules, 384 N.J. Super. 451, 454

A-0285-23

(App. Div. 2006) (quoting N.J. State League of Muns. v. Dep't of Cmty. Affs., 310 N.J. Super. 224, 240 (App. Div. 1998), aff'd, 158 N.J. 211 (1999)).  NJDEP regulates storm water management via the Stormwater Management Rules (Stormwater Rules) N.J.A.C. 7:8-1.1 to 6.3.  See In re Stormwater Mgmt. Rules, 384 N.J. Super. at 454.  NJDEP's management of stormwater issues includes stormwater runoff that may collect pollutants from the land surface, creating problems related to water quality and quantity.  NJDEP also reviews stormwater management measures designed "to control or reduce stormwater runoff and associated pollutants."  N.J.A.C. 7:8-1.2.

As part of its stormwater management authority and oversight, NJDEP considers the natural features of the land as well as the specific features associated with the actual construction of the proposed development project. NJDEP employs the New Jersey Stormwater Best Management Practices (BMP) Manual in reviewing stormwater management matters.[3]  The BMP Manual

---

[3]  The BMP Manual provides guidance for achieving stormwater management compliance.  N.J. Dep't of Env't Prot., N.J. Stormwater Best Mgmt. Pracs. Manual, Post-Constr. Stormwater Mgmt. (N.J.A.C. 7:8) https://dep.nj.gov/stormwater/bmp-manual (Oct. 9, 2024).  The BMP Manual expressly allows "[a]n alternative stormwater management measure, alternative removal rate, and/or alternative method to calculate the removal rate may be used if the design engineer demonstrates the capability of the proposed alternative stormwater management measure and/or the validity of the alternative rate or method to the review agency."  N.J.A.C. 7:8-5.2(g).

provides recommendations, not requirements. <u>See</u> <u>In re Stormwater Mgmt.</u> <u>Rules</u>, 384 N.J. Super. at 457; N.J.A.C. 7:8-5.9. Alliance erroneously asserts the BMP Manual imposes specific requirements rather than recommendations and technical guidance.

Langan proposed several stormwater management control measures for the Project and the Property in accordance with the FHACA, the SMA, the Rules, and the Stormwater Rules. The measures for stormwater control at the Property included bioretention basins, infiltration basins, a grass swale, manufactured treatment devices (MTDs), and modifications to existing Basins 2 and 3.

Throughout the Permit application process, Langan addressed each deficiency raised by NJDEP and revised the Permit application accordingly. With each revision to the application, Alliance filed supplemental public comments and submitted additional reports from Princeton Hydro objecting to NJDEP's issuance of the Permit and maintaining the stormwater management designs remained flawed.

On February 8, 2023, Langan advised NJDEP that the Permit application was revised "to include infiltration features decreasing post-development stormwater volume release" and affirmed the calculations were made using "the

base [Natural Resources Conservation Service] soil conditions."  Langan also confirmed "[c]ompliance with small[-]scale and large[-]scale BMP features ha[d] not significantly changed" after its latest revisions to the Property's stormwater management controls.

In February 2023, an Alliance member expressed concern that NJDEP was not using updated databases regarding bird sightings.  The member asserted a bald eagle was sighted within a mile of the Property.

In April 2023, Langan again revised the Permit application.  In a letter to NJDEP enclosing the revised application, Langan explained the "site provide[d] stormwater attenuation, water quality compliance and groundwater recharge compliance."  Langan also advised "[a]djustments to these features were previously reviewed without further comment" by NJDEP.  The letter noted the "elimination of a proposed stormwater outfall into a center wetland complex" and use of the "existing storm network and outfalls" would "decreas[e] wetland and transition area disturbances."

Alliance submitted a letter to NJDEP in response to the revised Permit application.  The letter enclosed an updated report from Princeton Hydro based on its review of the revised application.  Alliance renewed its objection to the Project's stormwater management plan.  Princeton Hydro's report repeated

7

concerns regarding the stormwater management proposal, including the use of MTDs and importing new soil to facilitate groundwater recharge. According to Princeton Hydro, the imported soil would not solve the groundwater recharge issues and would continue to create a "bottleneck" because the existing native soil would drain more slowly than the imported soil. Additionally, Princeton Hydro questioned peak flow rate calculations included with Johnson's revised Permit application.

On August 10, 2023, NJDEP issued a certificate enlarging the Property's existing conservation easement and establishing a new and separate conservation easement covering "19.75 additional acres of freshwater wetlands, State open waters, and transition areas." In conjunction with this decision, NJDEP submitted a supplemental memo addressing some of the public comments in opposition to the Permit application.

Regarding the presence of wildlife on the Property, a research scientist with NJDEP stated there was no basis for upgrading the wetlands resource value because the Property was not located in any relevant bald eagle nest buffer zones and the size of the wetlands on the Property was not suitable to accommodate a bald eagle habitat. NJDEP's research scientist reached the same conclusion regarding other bird species allegedly inhabiting the Property. She further

explained there was no need to undertake a two-year wildlife study based on the limited habitat availability associated with the Property's wetlands.

On August 10, 2023, NJDEP advised Johnson the Permit application was under review and asked Langan to resubmit certain documents. In requesting the documents, NJDEP accepted Langan's explanation that the design of the constructed wetlands basin was not a "forebay."[4] Further, NJDEP informed Langan that its description of the flow path through the wetlands basin alleviated NJDEP's remaining concerns.

On August 14, 2023, NJDEP approved the Permit. NJDEP concluded the Project met "the requirements of the Stormwater Management [R]ules at N.J.A.C. 7:8." Further, NJDEP stated Johnson "must adhere to the operations and maintenance plan for the stormwater management measures incorporated into the design . . . in accordance with N.J.A.C. 7:8-5.8." Additionally, NJDEP notified Johnson that the "[g]uidance set forth in the [BMP] Manual should be followed to the maximum extent practicable." Alliance appealed NJDEP's issuance of the Permit.

---

[4] A "forebay" is an artificial pool of water located in front of a larger body of water. Forebays are often used to allow sediment and solids to settle out from stormwater runoff. See BMP Manual, Chapter 9.

On appeal, Alliance argues NJDEP's approval of the Permit was arbitrary, capricious, and unreasonable. Further, Alliance contends the Property's stormwater management system does not comport with the applicable statutes and regulations. Additionally, it claims NJDEP failed to address substantive issues raised through public comment and consider the impacts to endangered or threatened species on the Property. We reject these arguments.

I.

We first consider Alliance's argument the Permit should be rescinded because the Property's stormwater management system does not meet the FHACA, the SMA, the Stormwater Rules, and the Rules. Specifically, Alliance contends the approved Permit did not meet the water quality standards due to the configuration of the proposed stormwater management systems combined with the use of MTDs. Alliance further claims the approved Permit lacked sufficient groundwater recharge under BMP's standards. Alliance also asserts the approved Permit failed to comply with the BMP's peak flow requirement calculations. Therefore, Alliance asserts NJDEP erred in issuing the Permit.

"The scope of review of an administrative agency determination is limited." Del. Riverkeeper Network v. N.J. Dep't of Env't Prot., 463 N.J. Super. 96, 112 (App. Div. 2020). On appeal, we "will not reverse the agency's decision

unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." N.J. Highlands Coal. v. N.J. Dep't of Env't Prot., 456 N.J. Super. 590, 602-03 (App. Div. 2017), aff'd as modified, 236 N.J. 208 (2018).

"The party who challenges [NJ]DEP's decision to permit development of a certain location has the 'burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary.'" Id. at 603 (quoting In re Stream Encroachment Permit, Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 597 (App. Div. 2008)). We accord "traditional deference to an agency's specialized expertise[, which] is even stronger when the agency, like [NJ]DEP in regard to wetlands, has been delegated discretion to determine the specialized and technical procedures for its tasks." In re Thomas Orban/Square Props., LLC, 461 N.J. Super. 57, 72 (App. Div. 2019) (internal citations and quotation marks omitted).

We recognize the role "that administrative expertise can play in the rendering of a sound administrative determination." In re the Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 389 (2013).

"Where an agency's expertise is a factor, a court defers to that expertise, particularly in cases involving technical matters within the agency's special competence." In re Adoption of Amends. to the Ne., Upper Raritan, Sussex Cnty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. 571, 583 (App Div. 2014) (citing In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004)). "[J]udicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to . . . deal[] with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues . . . .'" Ibid. (alterations in original) (quoting N.J. State League of Muns. v. Dep't of Cmty. Affs., 158 N.J. 211, 222 (1999)).

We "extend substantial deference to an agency's interpretation of its own regulations, reasoning that 'the agency that drafted and promulgated the rule should know the meaning of that rule.'" Thomas Orban, 461 N.J. Super. at 72 (quoting In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 341-42 (App. Div. 2005)). "[B]ecause a permitting decision by [NJDEP] is a quasi-judicial determination, reasoned fact-finding is essential." Ibid. As such, a permitting decision "must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for

12

the . . . purpose of informing the . . . parties and any reviewing tribunal . . . so that it may be readily determined whether the result is sufficiently and soundly grounded." Musconetcong Watershed Ass'n v. N.J. Dep't of Env't Prot., 476 N.J. Super. 465, 488 (App. Div. 2023) (quoting In re the Application for Med. Marijuana Alt. Treatment Ctr. for Pangaea Health & Wellness, LLC, 465 N.J. Super. 343, 375 (App. Div. 2020)).

Here, there is substantial credible evidence in the record supporting NJDEP's issuance of the Permit. As the agency tasked with regulating stormwater management controls in this State, NJDEP reviewed all aspects of the application in detail, frequently requesting Johnson's engineers submit revised information on numerous technical issues and stormwater control features to ensure compliance with FHACA, the SMA, and Stormwater Rules.

Prior to approving the Permit, NJDEP addressed comments advanced by members of the public, including Alliance and Princeton Hydro. NJDEP determined the application met all stormwater management statutes and rules. The concerns regarding the Indian Run Creek and its tributaries were incorporated in NJDEP's thorough review of the Permit application. Based on its detailed review of voluminous documents, calculations, and maps provided by Langan and Princeton Hydro, NJDEP concluded stormwater runoff from the

Property would drain appropriately under the proposed stormwater management plan and would not adversely affect adjacent properties.

Additionally, NJDEP expressly concluded the Permit application complied with "flood storage volume requirements of N.J.A.C. 7:13-11.4"; complied with "N.J.A.C. 7:13-12.1, as the proposed [P]roject is not likely to cause significant and adverse effects on water quality or supply, aquatic biota, flooding, drainage, channel stability, threatened or endangered species or their current or documented historic habitats, navigation, energy production, or fishery resources"; and complied with stormwater regulations.

Specifically, NJDEP approved the use of "the Delmarva unit hydrograph," "NOAA's Type C rainfall distribution," and "hydrologic soil groups . . . consistent with the USDA Web Soil Survey" as part of the stormwater management calculations.  NJDEP's final report concluded:

> As can be seen in detail in the Green Infrastructure[5] section of this report below, several stormwater management [BMPs] are proposed.  These consist of two constructed wetlands basins (to replace the incomplete stormwater management basins already onsite), five bioretention basins, 20 green infrastructure [MTDs], and nine infiltration basins.

---

[5] Green infrastructure uses natural systems to improve water quality, mitigate flooding, and reduce stormwater runoff.  See U.S. Env't Prot. Agency, Green Infrastructure, www/epa.gov/green-infrastructure (Feb. 15, 2025).

A-0285-23

Natural features on the site have been preserved to the maximum extent practicable. The applicant has submitted an adequate operations and maintenance manual. Furthermore, the geotechnical investigation accompanying the application is consistent with Chapter 12 of the BMP Manual. All of the necessary BMPs will have adequate separation from the seasonal high groundwater table and appropriate mounding analyses were performed for infiltrating BMPs.

NJDEP squarely addressed the contentions in Princeton Hydro's reports that the Project's proposed stormwater management system was deficient. After considering statements by Princeton Hydro concerning the stormwater management plan, NJDEP declared "all applicable requirements of N.J.A.C. 7:8 Stormwater Management [R]ules (last amended March 2, 2021) were met, including stormwater quantity, quality, and groundwater recharge as well as the newly implemented Green Infrastructure elements." NJDEP also addressed Princeton Hydro's concern regarding inundation of the "forebay." It explained "[t]he forebay is actually not the forebay but it is lower marsh area of the constructed wetlands basin. Because there is no requirement for a constructed wetlands basin to be elevated above the seasonal high[-]water table and instead it is fed by groundwater, this concern [was] alleviated."

Having reviewed the record, we are satisfied there was sufficient credible evidence for NJDEP's issuance of the Permit. The record clearly demonstrated

the application process was thorough, and incorporated feedback from departments within NJDEP, such as the New Jersey Historic Preservation Office, as well as outside groups, such as Alliance and other concerned members of the public. Johnson and Langan meaningfully and comprehensively responded to comments raised by NJDEP and the public. NJDEP's report, issued in conjunction with the approved Permit, evidenced the agency's satisfaction with all aspects of the application.

Further, we are satisfied NJDEP acted within its mandate under FHACA, the SMA, the Rules, and Stormwater Rules by regulating the development of the Property within a flood hazard area. Under our well-settled standard of review, deferring to an agency's expertise regarding hydrogeologic tables, flow calculations, soil samples, and stormwater system design, NJDEP's issuance of the Permit was not arbitrary, capricious, or unreasonable.

While Alliance and Princeton Hydro may disagree with NJDEP's decision to issue the Permit, the agency's highly specialized expertise in stormwater management control is beyond debate. The agency meticulously evaluated flooding and stormwater concerns associated with the Property and the Project prior to issuing the Permit.

II.

We next address Alliance's claim that NJDEP failed to consider the presence of the bald eagle and other wildlife at the Property in issuing the Permit. Alliance further contends NJDEP was required to conduct a formal bird survey of the Property. We reject these arguments.

After receiving information from Alliance regarding a bald eagle sighting near the Property, NJDEP determined bald eagle sightings only needed to be addressed in relation to wetlands resource values. NJDEP further explained "for other species including great blue heron, [S]avannah sparrow, American kestrel, and grasshopper sparrow," the wetlands resource value was irrelevant because, at the time, "these species are either not threatened/endangered or not considered freshwater wetland species under the Freshwater Wetland Protection Act rules."

Regarding Alliance's bald eagle concerns, NJDEP stated:

> Even with the accepted bald eagle sighting records, the . . . [P]roperty would not be valued, or documented, for bald eagle foraging by the next version of Landscape Project Mapping. The Program reached out to Fish and Wildlife to ascertain whether the accepted eagle sightings would result in a change to mapping. Fish and Wildlife noted that this area would not be documented as bald eagle foraging habitat under the future version of mapping because valuation for mapping of bald eagle foraging require[s] waterbodies greater than 8 hectares (Peterson 1986). The wet detention basin in the center of the [P]roperty (1.8

17

hectares) along with the wet detention basin along the western side of the site (2.1 hectares) only equal a combined 3.9 hectares of open water on the [P]roperty. As a result, lack of Landscape documentation for bald eagle foraging now and in the future further supports an intermediate resource value classification of the wetlands on site.

Regarding Alliance's claim NJDEP should have required a formal wildlife survey, under the Rules, NJDEP reviews design and construction standards affecting a present or documented habitat for threatened or endangered species. See N.J.A.C. 7:13-11.6. The Rules set forth when a survey or habitat assessment for endangered or threatened species is required. Under N.J.A.C. 7:13-11.6(e):

The Department shall require a survey and/or a habitat assessment for threatened or endangered species as part of an environmental report, as described at N.J.A.C. 7:13-18.8(b), for an individual permit for any regulated activity which is likely to do either of the following:

1. Disturb an area known to contain a threatened or endangered species; or

2. Disturb any habitat that could support a threatened or endangered species.

Here, Johnson and Langan provided NJDEP with sufficient credible evidence supporting the agency's determination that the Property is not located within the buffer zone of a bald eagle's nest. Alliance conceded its bald eagle sighting was about a mile from the Property and, therefore, outside the buffer

zone for a bald eagle habitat. Additionally, there is ample credible evidence in the record that the habitats on the Property are too small for bald eagle foraging. Further, because the Property lacks significant wetlands resources per the LOI to support a habitat for endangered or threatened species, N.J.A.C. 7:13-11.6(e) is inapplicable and a survey was not required.

On this detailed record, we are satisfied NJDEP adequately considered the information provided by Alliance and reached a conclusion regarding endangered and threatened species that was amply and appropriately supported. See R. 2:11-3(e)(1)(D).

To the extent we have not addressed any of Alliance's remaining arguments, the arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0285-23