22 A.3d 94 (2011)
420 N.J. Super. 552
In the Matter of the ADOPTION OF N.J.A.C. 7:15-5.24(b) and N.J.A.C. 7:15-5.25(e).
No. A-3262-08T1.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 2011.
Decided June 29, 2011.
*97 David R. Oberlander argued the cause for appellant Bi-County Development Corporation (Bisgaier Hoff, LLC, attorneys; Mr. Oberlander, on the brief).
Jane F. Engel, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Engel, on the brief).
Eastern Environmental Law Center, attorneys for amici curiae New Jersey Audubon Society and American Littoral Society (William Schulte and Julia LeMense, on the brief).
Before Judges PARRILLO, YANNOTTI and ROE.
The opinion of the court was delivered by
PARRILLO, P.J.A.D.
This appeal asks us to decide the legality of two provisions of the Department of Environmental Protection's (DEP) Water Quality Management Planning Rules (WQMP Rules), N.J.A.C. 7:15, which set policies and procedures for State, County and area water quality management planning. The first regulation, N.J.A.C. 7:15-5.24, prohibits the extension of sewage lines in "environmentally sensitive areas," including wetlands, riparian zones, areas with threatened or endangered species habitat (protected habitat), and areas with natural heritage priority sites (natural heritage sites). The other regulation, N.J.A.C. 7:15-5.25(e), sets a maximum nitrate level for septic system discharge. Appellant Bi-County Development Corporation challenges these provisions as constituting non-water related land use regulations and therefore ultra vires, prohibited by and inconsistent with various statutes and principles, and arbitrary and capricious. For the reasons that follow, we conclude these regulations are valid.
By way of background, the DEP's enabling statute, N.J.S.A. 13:1D-1 to -137, authorizes the agency to "formulate comprehensive policies for the conservation of the natural resources of the State [and] the promotion of environmental protection.. . ." N.J.S.A. 13:1D-9. With specific regard to water resources, the Water Quality Planning Act (WQPA), N.J.S.A. 58:11A-1 to -16, provides for the restoration and maintenance of water quality in *98 this State, including a planning process to control and maintain water quality. N.J.S.A. 58:11A-2. Similarly, the Water Pollution Control Act (WPCA), N.J.S.A. 58:10A-1 to -60, "provides for restoration, enhancement and maintenance of the State's waters, including ground and surface waters, and set[s] up administrative controls respecting various treatment facilities." N.J. Builders Ass'n v. Fenske, 249 N.J.Super. 60, 64, 591 A.2d 1362 (App.Div. 1991). Together, these acts constitute the Legislature's response to the Federal Water Pollution Control Act (Federal Act), 33 U.S.C.A. §§ 1251 to 1376, which established an integrated federal system to address water pollution throughout the country. Thus, the Legislature directed the DEP to develop and implement water quality programs "in concert with other social and economic objectives," N.J.S.A. 58:11A-2a, and integrate other "Federal, State, regional and local comprehensive land use, functional and other relevant planning activities, programs and policies" into its water quality planning program. N.J.S.A. 58:11A-2b; see also N.J.S.A. 58:11A-7.
The Federal Act "requires identification of areas with substantial water quality control problems and initiation of areawide Waste Treatment Management plans." N.J. Builders Ass'n, supra, 249 N.J.Super. at 63, 591 A.2d 1362 (referring to 33 U.S.C.A. § 1288(a), (b)). Accordingly, towards the goal of "restor[ing] and maintain[ing] the chemical, physical and biological integrity of the waters of the State[,]" N.J.S.A. 58:11A-2b, the WQPA mandates the creation of wastewater treatment management planning areas and authorizes the DEP to set water quality standards, implement areawide waste treatment management plans within each of the planning areas, and adopt rules and regulations to effectuate the objectives of the WQPA. N.J.S.A. 58:11A-5, -7 and -9; see also Toll Bros., Inc. v. N.J., Dep't of Envtl. Prot., 242 N.J.Super. 519, 526, 577 A.2d 845 (App.Div.1990).
These areawide plans address, among other things, the facilities necessary to meet the municipal and industrial wastewater treatment needs of the area over a twenty year period; acquisition of land; financing; and construction priorities. N.J.S.A. 58:11A-5a. The plans also include the establishment of a regulatory program to provide control or treatment of all point and nonpoint sources of pollution to the extent practical, and to regulate the location, modification and construction of any facilities within the planning area which may result in any discharge. N.J.S.A. 58:11A-5c(1) and (2). Moreover, to address pollution associated with construction and land use activities, each areawide plan must include:
(h) A process: (1) to identify construction activity related sources of pollution; and (2) to set forth procedures and methods, including land use requirements, to control to the extent feasible such sources; [and]
(k) A process to control the disposal of pollutants on land or in subsurface excavations within such area to protect ground and surface water quality.
[N.J.S.A. 58:11A-5.]
In accordance with the WQPA and Section 208 of the Federal Act, twelve areawide water quality management areas in New Jersey have been designated, and areawide plans exist for each one. These plans designate some areas as sewer service areas and others as areas for individual subsurface sewage disposal systems (ISSDSs). Sewer service areas use public sewers to dispose of wastewater through a collection system and interceptors to a centralized facility for treatment and ultimate *99 discharge into surface water or groundwater. ISSDSs consist of on-site treatment systems, commonly referred to as septic systems, that discharge directly into groundwater.
All projects and activities affecting water quality must be developed and conducted in a manner consistent with the areawide plan adopted for that area. N.J.S.A. 58:11A-10. Thus, if a planned development project is located outside the designated sewer service area of an areawide plan, the project must be developed using septic systems or the areawide plan must be amended to include the project in the sewer service area.
In 1989, the DEP promulgated the WQMP Rules, N.J.A.C. 7:15-1.1 to -9.8. In general, the WQMP Rules provide for a continuing water quality planning process and wastewater management planning requirements. The rules create the procedures to establish, amend and revise areawide water quality management (WQM) plans and wastewater management plans (WMP), which are components of the areawide plan. A WMP is "a written and graphic description of existing and future wastewater-related jurisdictions, wastewater service areas, and selected environmental features and treatment works." N.J.A.C. 7:15-1.5. When a WMP is approved by the DEP, it is incorporated into the areawide WQM plan as an amendment. N.J.A.C. 7:15-5.3. Every six years, county and local planning authorities must update the WMP. N.J.A.C. 7:15-5.23(a).
On May 7, 2007, the DEP proposed to readopt and amend the WQMP Rules. Following public notice, extensive public comment, agency responses, and three public hearings, the DEP adopted the amendments on July 7, 2008. As noted, the two amendments challenged here respectively restrict the extension of public sewer lines in areas with protected habitat or natural heritage sites, N.J.A.C. 7:15-5.24(b)1 and 2, and set a two mg/L nitrate level for septic system discharge, N.J.A.C. 7:15-5.25(e).

I.

A. OVERVIEW OF N.J.A.C. 7:15-5.24
N.J.A.C. 7:15-5.24 restricts the extension of public sewer lines in environmentally sensitive areas, which, in turn, limits the density of development that a property can sustain because it must use a septic system for waste water management. In relevant part, the regulation provides:
Delineation of sewer service areas
(a) Sewer service may only be provided to areas that are not identified as environmentally sensitive areas at (b) below, coastal planning areas listed at (c) below, or special restricted areas at (d) below, except as provided at (e) through (h) below. Nothing in this section shall preclude the wastewater management planning agency from excluding additional areas from sewer service based on local planning objectives, the lack of wastewater treatment capacity or other environmental concerns, including, but not limited to, source water protection.
(b) Environmentally sensitive areas shall be defined based on a composite geographic information systems (GIS) analysis, as any contiguous area of 25 acres[[1]] or larger consisting of any of *100 the following features alone or in combination:
1. Areas mapped as endangered or threatened wildlife species habitat on the Department's Landscape Maps of Habitat for Endangered, Threatened or Other Priority Species. The data are available as a download at the Department's webpage http://www.nj.gov/dep/gis/ listall.html titled "Landscape Project Data";
2. Areas mapped as Natural Heritage Priority Sites, excluding those lands within the boundaries of these sites mapped in the "Urban Lands" layer extracted from the Department's 1995/97 and 2002 Land Use/ Land Cover geographical information systems database as amended and updated. Both the Natural Heritage Priority Site data and the Urban Lands data are available as a digital data download at the Department's webpage http://www.nj.gov/dep/gis/listall. html titled "Natural Heritage Priority Sites"
[N.J.A.C. 7:15-5.24.]
While N.J.A.C. 7:15-5.24 established the general rule that the extension of sewer lines into environmentally sensitive areas is inappropriate, this restriction is not absolute. Subsection (e) allows an applicant the opportunity to challenge an environmentally sensitive designation:
(e) The applicant for a Water Quality Management plan amendment, including wastewater management plans, wastewater management plan updates or site specific amendments may rebut the presumption that the environmental data identified in (b) above is correct by providing the following information:
1. All of the information required at N.J.A.C. 7:15-5.26 for a habitat suitability determination that demonstrates that an area is not suitable habitat for endangered or threatened species;
2. A Letter of Interpretation issued by the Department pursuant to N.J.A.C. 7:7A-8 to demonstrate that an area is not wetlands; or
3. Any other information that demonstrates that the Department's GIS coverage is inaccurate at a particular location.
Furthermore, subsections (g) and (h) create exceptions to the exclusions stated in subsection (b):
(g) Sewer service areas may include environmentally sensitive areas listed at (b) above provided:
1. The environmentally sensitive area is included either to allow infill development, or to remove undulations in the sewer service area boundary as necessary to create a linear boundary that relates to recognizable geographic features as allowed by N.J.A.C. 7:15-5.20(b)2; and
2. The Department determines that the environmentally sensitive areas included in the sewer service area are not critical to a population of endangered or threatened species, the loss of which would decrease the likelihood of the survival or recovery of the species in the State.
(h) Sewer service areas may include environmentally sensitive areas listed at (b) above provided it is designed to accommodate center based development[[2]] *101 and is an element of an endorsed plan approved by the State Planning Commission where:
1. The Department determines that the environmentally sensitive areas included in the sewer service area are not critical to a population of endangered or threatened species, the loss of which would decrease the likelihood of the survival or recovery of the species in the State;
2. The Department has determined that the endorsed plan adequately addresses the protection of environmentally sensitive areas located outside of the designated sewer service area; and
3. The wastewater management planning agency has identified an adequate wastewater management alternative in accordance with N.J.A.C. 7:15-5.25(a) through (c).
In the New Jersey Register, the DEP explained that the WQMP Rules prohibit the extension of sewer service lines in environmentally sensitive areas in order to conserve public resources and because those areas cannot sustain dense development due to their environmental sensitivities. 39 N.J.R. 1896 (May 21, 2007); 40 N.J.R. 4110, 4113 (July 7, 2008). The DEP explained:
The goal of the rules is not to prohibit all development in threatened and endangered species habitats. The rules intend to eliminate significant conflicts between the Department's natural resource protection mandates and the extension of centralized sewer service, consistent with the intent of the continuing planning processes required under Section 208 of the Federal Clean Water Act and reinforced through the New Jersey Water Quality Planning Act. In places where sewer service is not provided, the rules allow individual subsurface sewage disposal systems (septic systems) as an appropriate wastewater management alternative. In general, septic system development will occur at a lower density than development that would be supported by public sewers. This lower density development is more consistent with the conservation of these sensitive environmental resources. However, the real emphasis of the rules is to eliminate the encouragement and public subsidy of development in environmentally sensitive areas such as wetlands, category one stream buffers, Natural Heritage Priority Sites and threatened and endangered species habitats.
[40 N.J.R. 4113 (July 7, 2008).]

B. STANDARD OF REVIEW
As a threshold matter, we note that courts generally defer to agency decisions and presume that the regulations they pass are valid because "agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are `particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that . . . rulemaking would invite.'" N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999) (quoting Bergen Pines Cnty. Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 474, 476 A.2d 784 (1984)).
An exception exists when a regulation is challenged as contrary to the agency's statutory authority. Ibid. In that *102 case, the issue turns on statutory construction.
"When construing a statute, courts initially consider the statute's plain meaning." National Waste Recycling, Inc. v. Middlesex County Improvement Auth., 150 N.J. 209, 223, 695 A.2d 1381 (1997). If the plain language of a statute creates uncertainties or ambiguities, a reviewing court must examine the legislative intent underlying the statute and "construe the statute in a way that will best effectuate [that] intent."

Ibid. (quoting State v. Szemple, 135 N.J. 406, 422, 640 A.2d 817 (1994)). The general legislative intent influences the interpretation of a statute's component parts. Ibid. To that end, courts must read statutes "sensibly rather than literally." Roig v. Kelsey, 135 N.J. 500, 515, 641 A.2d 248 (1994) (quoting Schierstead v. City of Brigantine, 29 N.J. 220, 230, 148 A.2d 591 (1959)).
[Id. at 224-25, 729 A.2d 21.]
Additionally, an agency's legislative authority can be implied by the statute or by "`the entire legislative scheme of which it is a part.'" In re Stormwater Mgmt. Rules, 384 N.J.Super. 451, 461, 894 A.2d 1241 (App.Div.) (quoting Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129, 527 A.2d 1368, (1987)), certif. denied, 188 N.J. 489, 909 A.2d 724 (2006). A court will imply powers to enable the agency to effectuate the intent of the statute. Ibid.

C. ANALYSIS
Appellant's primary argument is that the regulations contained in N.J.A.C. 7:15-5.24(b)1 and 2 are not water quality regulations authorized by the WQPA, but rather are land use regulations that limit density, the authority for which belongs to the municipalities pursuant to the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163. We disagree. The challenged rule regulates the extension of sewage lines in environmentally sensitive areas, which the DEP undeniably is authorized to promulgate pursuant to both the WQPA and the WPCA. That the regulation may have the collateral effect of limiting the density of development that such property can sustain with a septic system does not transform the rule into an unauthorized land use regulation. Nor does the incidental benefit of protecting endangered and threatened species and natural heritage sites render the regulation ultra vires or contrary to, or beyond, the stated statutory purpose.
In the findings section of the WQPA, the Legislature declared
that the people of the State have a paramount interest in the restoration, maintenance and preservation of the quality of the waters of the State for the protection and preservation of public health and welfare, food supplies, public water supplies, propagation of fish and wildlife, agricultural and industrial uses, aesthetic satisfaction, recreation, and other beneficial uses;

[N.J.S.A. 58:11A-2a (emphasis added).]
The Legislature continued:
[T]he severity of the water pollution problem in the State necessitates continuing water quality management planning in order to develop and implement water quality programs in concert with other social and economic objectives. The Legislature further finds that water quality is dependent upon factors of topography, hydrology, population concentration, industrial and commercial development, agricultural uses, transportation and other such factors which vary among and within watersheds and other regions of the State and that pollution abatement programs should consider *103 these natural and man-made conditions that influence water quality.
[N.J.S.A. 58:11A-2a (emphasis added).]
Thus, the Legislature instructed the DEP to formulate water quality plans and regulations "in concert with other social and economic objectives," N.J.S.A. 58:11A-2a, and to "coordinate and integrate" the plans "with related Federal, State, regional and local comprehensive land use, functional and other relevant planning activities, programs and policies." N.J.S.A. 58:11A-2b. This directive serves as a standard to guide the DEP's discretion in setting water quality rules.

(i)
One such related environmental, social and land use policy is embodied in the Endangered and Nongame Species Conservation Act (ENSCA), N.J.S.A. 23:2A-1 to -13, which is intended to "manage all forms of wildlife to insure their continued participation in the ecosystem" and to "maintain and to the extent possible enhance their numbers." N.J.S.A. 23:2A-2a and b. Of course, a species cannot continue its participation in the ecosystem or enhance its numbers without suitable habitat.
Contrary to appellant's contention, however, N.J.A.C. 7:15-5.24 is not a "habitat" regulation, but simply implements the legislative intent that DEP consider threatened and endangered species as well as their habitat in setting water quality rules. On this score, the ENSCA provides:
"Endangered species" means any species or subspecies of wildlife whose prospects of survival or recruitment are in jeopardy or are likely within the foreseeable future to become so due to any of the following factors: (1) the destruction, drastic modification, or severe curtailment of its habitat, or (2) its over-utilization for scientific, commercial or sporting purposes, or (3) the effect on it of disease, pollution, or predation, or (4) other natural or manmade factors affecting its prospects of survival or recruitment within the State, or (5) any combination of the foregoing factors.
[N.J.S.A. 23:2A-3c (emphasis added).]
The ENSCA also authorizes the DEP to conduct investigations concerning wildlife in order to develop information relating to populations, distribution, habitat needs, limiting factors and other biological and ecological data to determine management measures necessary for their continued ability to sustain themselves successfully. On the basis of such determinations the commissioner shall develop management programs which shall be designed to insure the continued ability of wildlife to perpetuate themselves successfully.

[N.J.S.A. 23:2A-4a (emphasis added).]
Thus, N.J.A.C. 7:15-5.24(b)1 helps "insure the continued ability of wildlife to perpetuate themselves successfully" by restricting development in areas with protected habitat. N.J.S.A. 23:2A-4a.
Finally, ENSCA authorizes penalties for violations thereof and allows for the
[r]ecovery of compensatory damages for any loss or destruction of natural resources, including but not limited to, wildlife, fish, aquatic life, habitat, plants, or historic or archeological resources, and for any other actual damages. . . .
[N.J.S.A. 23:2A-10c(4) (emphasis added).]
A violator may also be ordered to "restore the site of the violation." N.J.S.A. 23:2A-10c(5). If the Legislature had intended to restrict the DEP's authority to species only, as appellant contends, it would not have included habitat restoration in the penalty section of the statute.
Appellant also argues that N.J.A.C. 7:15-5.24(b)1 is invalid because it uses overly *104 broad Landscape Maps to designate "habitat," which is not limited to land that is in fact occupied by protected or threatened species, but includes land that protected and threatened species may be expected to use based on past sightings. We disagree.
Because most species are "mobile and transient," the DEP's protected habitat designation is based on whether the land is suitable for a species known to occupy the area, not strictly on whether the species was seen on the land during any particular survey. 40 N.J.R. 4113 (July 7, 2008).
The DEP explained:
[T]he absence of a particular specie on a particular site and survey date cannot result in a conclusion that the specie does not rely on the habitat. It is more appropriate to assess the habitat characteristics through a habitat suitability determination to determine whether the habitat has been altered in such a way as to render it unsuitable for that specie. The rules recognize that the Landscape Project maps present a snapshot in time and that subsequent legal alterations to the landscape may have occurred that affect the suitability of the habitat. N.J.A.C. 7:15-5.26 establishes a Habitat Suitability Determination procedure for rebutting the Landscape data. This determination provides agencies the ability to rebut the presumption of habitat in an area where it can be demonstrated that the area, through legal alteration, is no longer suitable habitat for the relevant endangered or threatened species.
[Ibid.]
In In re Adopted Amendments to N.J.A.C. 7:7A-2.4, 365 N.J.Super. 255, 259, 839 A.2d 60 (App.Div.2003), we considered the validity of N.J.A.C. 7:7A-2.4, a regulation that "adopt[ed] the Landscape Project method to classify those wetlands which support the habitats of threatened or endangered species." The DEP had promulgated N.J.A.C. 7:7A-2.4 pursuant to the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, which required the DEP to "`develop a system for the classification of freshwater wetlands based upon criteria which distinguish among wetlands of exceptional resource value, intermediate resource value, and ordinary resource value.'" Id. at 260, 839 A.2d 60 (quoting N.J.S.A. 13:9B-7). Although "habitat" was not defined, the FWPA described wetlands of exceptional resource value as wetlands
which are present habitats for threatened or endangered species, or those which are documented habitats for threatened or endangered species which remain suitable for breeding, resting, or feeding by these species during the normal period these species would use the habitat. A habitat shall be considered a documented habitat if the [DEP] makes a finding that the habitat remains suitable for use by the specific documented threatened and endangered species, based upon information available to it, including but not limited to, information submitted by an applicant for a freshwater wetlands permit.
[N.J.S.A. 13:9B-7a(2).]
Thus, whether wetlands had exceptional resource value was dependent upon whether the land was presently habitat for, or was documented habitat for, endangered or threatened species.
Like appellant here, the challengers in that case argued that the Landscape Project method of determining protected habitat was overly broad because it was not limited to land on which protected and endangered species had been seen. In re Adopted Amendments to N.J.A.C. 7:7A-2.4, supra, 365 N.J.Super. at 259, 839 A.2d 60. We rejected that argument, reasoning that "[t]he concept of habitat is rather *105 broad," and, according to Webster's II New College Dictionary 497-98 (1999), is "the environment in which an organism or biological population usu[ally] lives or grows." Id. at 261, 839 A.2d 60 (alteration in original). We found the DEP's use of the Landscape Project and Maps proper, explaining that the FWPA
does not restrict classification of such wetlands to habitats in which an endangered or threatened species either has presently been sighted or has been sighted in the past. Its focus is upon the habitats of such species and affords DEP broad discretion to document such habitats. "[A] documented habitat" exists if DEP "makes a finding that the habitat remains suitable for use by the" threatened or endangered species. N.J.S.A. 13:9B-7(a)(2). The Landscape Project method broadens the inquiry to include habitats in which there have been actual sightings or other physical evidence of an endangered or threatened species, and contiguous wetlands which contain the natural characteristics that make it suitable for that species to populate. The evident premise is that endangered or threatened species are not stationary. As DEP has found, "[m]any rare species populations require large contiguous blocks of habitat to survive." It is difficult to quarrel with DEP's observation that "[t]he rapid suburbanization of our landscape has led to the loss and degradation of critically important wildlife habitats, and the fragmentation and isolation of the habitats that remain." Moreover, Builders [i.e., the challenger] does not dispute DEP's examples of a 40 percent loss of "the remaining critical migratory bird stopover habitat on the lower third of the Cape May peninsula" and "approximately 50 percent of the State's bog turtle habitat." DEP's effort to adopt a more protective approach through the Landscape Project method is neither inconsistent with the governing statute, unsupported by the record, nor arbitrary or capricious.
[Id. at 266, 839 A.2d 60.]
We discern no reason to depart from our ruling in In re Adopted Amendments to N.J.A.C. 7:7A-2.4. Like the FWPA, the ENSCA does not define "habitat." As in that case, we adopt its ordinary meaning, which is "rather broad," and includes "the environment in which an organism or biological population usu[ally] lives or grows." Id. at 261, 839 A.2d 60. Thus, "habitat" includes areas in which species can be expected to live based on past sightings. Id. at 266, 839 A.2d 60.
Moreover, the challenged regulations provide both for a process to dispute the protected "habitat" designation and rebut the presumption that environmentally sensitive lands are not suitable for the extension of sewage lines, and for an exemption from this restriction. Thus, N.J.A.C. 7:15-5.24(e) allows an applicant to "rebut the presumption that the environmental data identified in (b)" is correct. Subsection (e)3 allows the applicant to challenge the accuracy of the DEP's geographic information system (GIS) information. Additionally, N.J.A.C. 7:15-5.24(h)1 allows for the extension of sewer lines into environmentally sensitive areas to accommodate center based development. Thus, an applicant has the ability to both demonstrate that the DEP erroneously identified endangered species habitat on the Landscape Map and to extend sewage lines for center based development.

(ii)
Another related State policy which the WQPA instructs the DEP to consider in setting water quality rules is that expressed in the Natural Heritage Program Act (NHPA), N.J.S.A. 13:1B-15.146 to -15.150, *106 namely to preserve and protect the State's "rich natural heritage." N.J.S.A. 13:1B-15.146. The Act's findings and declarations section provides that "this State has a rich natural heritage which is in danger of disappearing as the State continues to experience economic and industrial growth." N.J.S.A. 13:1B-15.146. In 1984, "a program to conduct an inventory of rare plants, animals, and natural communities throughout New Jersey was established" through an agreement between the DEP and The Nature Conservancy, a nonprofit conservative organization. Ibid. That program, however, had an end date. Ibid. Thus to further the purpose of that program and "preserve the State's natural diversity," the Legislature created the DEP-administered Natural Heritage Program. Ibid.
The purpose of the program is to identify the most critically important natural areas in the State and provide detailed up-to-date information on rare species and natural communities to planners, developers, and conservation agencies for use in resource management, environmental impact assessment, and both public and private land protection efforts.
[N.J.S.A. 13:1B-15.147.]
The functions of the program include, but are not limited to:
a. Maintaining and updating, through data collection and field work, a partially computerized data base which includes lists of rare and endangered species, and natural communities ranked according to rarity, as well as information on the location, quality, protection status, and sources of information of individual occurrences of the above species [i.e., rare species] and natural communities; and
b. Providing information on species and natural community occurrences to other government agencies, consultants, and private landowners seeking to preserve natural diversity and advice on how best to protect these occurrences.
[N.J.S.A. 13:1B-15.148.]
Despite this clear expression of State policy, appellant nevertheless contends the NHPA merely authorizes the DEP to create a database for informational purposes, without even notifying owners that their property has been designated a natural heritage site, and therefore offers no support for N.J.A.C. 7:15-5.24(b)2. Again, we disagree.
The NHPA makes clear that the purpose of the program is to provide information and advice on how to preserve natural resources "for use in resource management, environmental impact assessment, and both public and private land protection efforts." N.J.S.A. 13:1B-15.146 and -15.147. The Act's legislative history further provides:
The program would benefit the State by: 1) assisting managers of State-owned lands in preserving the natural diversity contained therein; 2) providing information on critical natural areas to developers and regulatory agencies in the early planning stages of projects; 3) directing public and private conservation organizations concerned with land acquisition to the most critically important natural areas in need of protection; and 4) working to avoid unnecessary destruction of rare species and natural communities through disbursement of ecological information.
[Senate Natural Res. & Agric. Comm. Statement, No. 1366 (N.J. 1988).]
Thus, the information provided by the NHPA was intended for the preservation *107 of the State's natural heritage sites. That the Legislature did not provide for individual notice to property owners does not establish otherwise.

(iii)
The public policies just discussed are reinforced in a host of other statutes, all strongly supportive of protecting the State's natural resources. For instance, the State Planning Act, N.J.S.A. 52:18A-196 to -207, provides:
It is in the public interest to encourage development . . . in locations that are well situated with respect to present or anticipated public services and facilities. . . and to discourage development where it may impair or destroy natural resources or environmental qualities that are vital to the health and well-being of the present and future citizens of this State. . . .
[N.J.S.A. 52:18A-196d.]
The WPCA "provides for restoration, enhancement and maintenance of the State's waters, including ground and surface waters, and set[s] up administrative controls respecting various treatment facilities." N.J. Builders Ass'n, supra, 249 N.J.Super. at 64, 591 A.2d 1362. Among other things, the WPCA directs the DEP to promulgate regulations on "classification of the surface and ground waters of the State and the determination of water quality standards for each such classification." N.J.S.A. 58:10A-4c. Similar to the WQPA findings, the WPCA provides:
It is the policy of this State to restore, enhance and maintain the chemical, physical, and biological integrity of its waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water.

[N.J.S.A. 58:10A-2 (emphasis added).]
Thus, the WPCA reiterates the State policy to protect natural resources.
Lastly, the DEP's general enabling statute, N.J.S.A. 13:1D-1 to -137, grants the agency vast authority to set policy and promulgate regulations "for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State." N.J.S.A. 13:1D-9.[3]
Thus, while each of the cited statutes, by itself, may not provide direct support for the WQMP Rules, which we find are expressly authorized by the WQPA, collectively they provide implicit authority for N.J.A.C. 7:15-5.24(b)1 and 2. In In re Stormwater Management Rules, 384 N.J.Super. 451, 894 A.2d 1241 (App.Div.), certif. denied, 188 N.J. 489, 909 A.2d 724 (2006), we relied on the WQPA, the *108 WPCA, the Stormwater Management Act, and the DEP's enabling statute to uphold a regulation that created "a 300-foot buffer on each side of water bodies designated as `Category 1' waters and their associated perennial or intermittent streams." Id. at 453, 894 A.2d 1241. None of the four statutes explicitly authorized the DEP to create buffers, but the statutes implied the authority. Id. at 464-65, 894 A.2d 1241. The DEP's enabling statute gave it "broad powers of conservation and ecological control," and the WQPA, the WPCA and the Stormwater Management Act sought to "promote water quality and prevent water pollution." Id. at 460-61, 894 A.2d 1241. The DEP determined that buffers provided the best method to protect Category 1 waters and the facts supported that determination. Id. at 466, 894 A.2d 1241. Thus, we found the regulation valid. Ibid.
Appellant attempts to distinguish In re Stormwater Management Rules by arguing that the creation of buffers was necessary to effectuate the intent of the WQPA, the WPCA and the Stormwater Management Act, whereas here, none of the statutes, read together or apart, authorizes the DEP to adopt water management rules that have a "non-water related purpose" like protecting endangered species habitat and natural heritage sites. We disagree.
As we explained in In re Stormwater Management Rules, supra, 384 N.J.Super. at 461, 894 A.2d 1241:
In determining whether the requisite authority is implied, if not expressed, a court will "consider not only the particular statute in question, but also the entire legislative scheme of which it is a part." Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129, 527 A.2d 1368 (1987). "`[E]very effort should be made to harmonize the law relating to the same subject matter.'" In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 469, 608 A.2d 288 (1992) (quoting Superior Air Prods. Co. v. NL Indus., Inc., 216 N.J.Super. 46, 63-64, 522 A.2d 1025 (App.Div.1987)). In other words, in deciding whether a particular regulation is statutorily authorized, a "court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." N.J. Guild [of Hearing Aid Dispensers v. Long], 75 N.J. [544,] 562, 384 A.2d 795 [(1978)]. Accord E.I. du Pont de Nemours & Co. v. State of N.J., Dep't of Envtl. Prot. & Energy, 283 N.J.Super. 331, 340, 661 A.2d 1314 (App. Div.1995). In this manner, "courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." N.J. Guild, supra, 75 N.J. at 562, 384 A.2d 795. That is because "the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities." Ibid. In fact,
the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation.
[In re N.J. Bd. of Pub. Utils., 200 N.J.Super. 544, 557, 491 A.2d 1295 (App. Div.1985).]
Here, as noted, the cited statutes establish a State policy to preserve and protect the environment, and the DEP, pursuant to its enabling statute, is charged with enforcing that policy through regulations and "comprehensive ecological and environmental plan[s]." N.J.S.A. 13:1D-9g. In this case, in promulgating the WQMP Rules, the *109 DEP took a comprehensive approach to water quality management by considering the effects that sewage lines and development would have on environmentally sensitive land. This comprehensive approach to regulating is consistent with the WQPA directive to consider related policies and land use in setting water quality rules, as well as with the breadth of the DEP's enabling legislation. Thus, while the WQPA provides direct support for N.J.A.C. 7:15-5.24(b)1 and 2, the WPCA, ENSCA, NHPA, State Planning Act and the DEP's enabling statute, read together, implicitly authorize the challenged regulation.

(iv)
Appellant next contends that N.J.A.C. 7:15-5.24(b)4 is inconsistent with and precluded by the Freshwater Wetlands Protection Act because it imposes significant development restrictions on areas adjacent to wetlands extending well beyond the restrictions imposed by the FWPA. We disagree.
The FWPA establishes a DEP-administrated permitting process for the following activities on freshwater wetlands:
(1) The removal, excavation, disturbance or dredging of soil, sand, gravel, or aggregate material of any kind;
(2) The drainage or disturbance of the water level or water table;
(3) The dumping, discharging or filling with any materials;
(4) The driving of pilings;
(5) The placing of obstructions; [and]
(6) The destruction of plant life which would alter the character of a freshwater wetland, including the cutting of trees;
[N.J.S.A. 13:9B-3.]
Additionally, the FWPA prohibits certain types of construction in "transition areas" or "buffers." N.J.S.A. 13:9B-3, -16, -17. A transition area is an "area of land adjacent to a freshwater wetland which minimizes adverse impacts on the wetland or serves as an integral component of the wetlands ecosystem." N.J.S.A. 13:9B-3. The FWPA groups freshwater wetlands into three categories (those of exceptional, intermediate and ordinary resource value, N.J.S.A. 13:9B-7), and restricts construction in transition areas adjacent to wetlands of exceptional and intermediate resource value. N.J.S.A. 13:9B-16a.
The regulatory program established by the FWPA "constitute[s] the only program for" the regulation of freshwater wetlands "in the State except to the extent that these areas are regulated consistent with the provisions of section 6 of this act," which relate to wetlands in the Meadowlands and Pinelands. N.J.S.A. 13:9B-30. See also In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 493, 852 A.2d 1083 (2004) (explaining that the FWPA provides the only regulatory authority for freshwater wetlands and that the DEP may not expand its regulatory authority of freshwater wetlands beyond that provided in the FWPA). The FWPA supersedes all other laws regulating freshwater wetlands. N.J.S.A. 13:9B-30. Thus, in In re Freshwater Wetlands Protection Act Rules, supra, our Court struck down as preempted by the FWPA a DEP regulation that added a buffer to wetlands areas. 180 N.J. at 490-91, 852 A.2d 1083.
In contrast, here, the challenged rule N.J.A.C. 7:15-5.24(b)4is not a wetlands building regulation and neither imposes significant restrictions on areas adjacent to wetlands nor expands the size of the buffer zone. The plain language of the regulation provides that sewage lines may not be extended to wetlands. N.J.A.C. 7:15-5.24(b)4. *110 It does not impose restrictions on areas adjacent to wetlands.
Further, the regulation is not precluded by the FWPA because it is does not regulate wetlands "based upon `wetlands' concerns alone." N.J. Chapter of Nat'l Ass'n of Indust. & Office Parks v. N.J. Dep't of Envtl. Prot., 241 N.J.Super. 145, 156, 574 A.2d 514 (App.Div.), certif. denied, 122 N.J. 374, 585 A.2d 379, 380 (1990). We have previously instructed that
where a regulation or statute, other than the Wetlands Act or its regulatory progeny, purports to regulate a freshwater wetland based upon "wetland" concerns alone, it has been superseded by the Wetlands Act. Where another regulation or statute has merely a tangential or ancillary effect upon a wetland and is predicated upon a different regulatory concern, be it water quality, flood control, pollution, or whatever, we do not believe the Legislature intended to render the other concern meaningless. Admittedly, recognizing and harmonizing these overlapping regulatory concerns cannot be reduced, in advance, to a precise formula which can be easily applied to each situation that arises. The DEP will no doubt have to harmonize these regulatory interests when considering applications both within and outside the Wetlands program. Suffice it for us to say that the DEP has no power under the Wetlands Act to regulate any wetlands aspects of exempt programs through other State permit programs. Wetlands regulatory aspects may only be administered under the Wetlands Act. However, the DEP must, of course, operate the other state permit programs effectively and conscientiously in pursuit of each program's statutory mandate; if such operation implicates wetlands aspects of these programs incidentally, we see no inexorable conflict. Each program has a primary goal. But harmony of administration with proper respect for property rights is the object, not sharply balkanized or insular programs.
[Id. at 156-57, 574 A.2d 514.]
The regulation at issue here is not based strictly on wetlands concerns. As the DEP explained,

N.J.A.C. 7:15-5.24(a) sets forth the general policy that large contiguous areas of environmentally sensitive resources, coastal planning areas where the extension of sewers would be inconsistent with New Jersey's Coastal Zone Management program and special restricted areas that are prone to natural hazards such as flooding, wave action and erosion should not be included in sewer service areas. The limitations on the extension of sewer service in these areas are consistent with the Department's mandate to protect the ecological integrity and natural resources of New Jersey, including water, threatened and endangered species, wetlands and unique and rare assemblages of plants. Centralized wastewater is inappropriate for these areas because it subsidizes and otherwise encourages the development of these resources at a density that is inconsistent with their protection and the environmental protection mandate of the Department.
[39 N.J.R. 1896 (May 21, 2007).]
Moreover, the fact that other statutes such as the FWPA, N.J.S.A. 13:9B-16, address water quality management and pollution in specific locations does not limit the breadth of the DEP's general regulatory authority over water quality standards, see, e.g., N.J. Builders Ass'n v. Dep't of Envtl. Prot., 169 N.J.Super. 76, 96, 404 A.2d 320 (App.Div.), certif. denied, 81 N.J. 402, 408 A.2d 796 (1979), or render the specific statutes superfluous. Indeed, the Legislature is free to adopt statutes that *111 overlap in subject matter or regulatory authority. In re Stormwater Mgmt. Rules, supra, 384 N.J.Super. at 464, 894 A.2d 1241. In that case, we stated:
The fact that other statutory enactments, such as the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30; the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21; the Flood Area Control Act, N.J.A.C. 7:13-1.1 to -1.7; the Delaware & Raritan Canal Park Act, N.J.S.A. 13:13A-1 to -15; the Pinelands Protection Act, N.J.S.A. 13:18A-1 to -29; and the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1 to -35, have expressly granted DEP authority to plan land development, or clearly delineate precise areas within which DEP may regulate, or specifically mandate discrete buffers, see, e.g., Am. Cyanamid Co. v. State, Dep't of Envtl. Prot., 231 N.J.Super. 292, 555 A.2d 684 (App.Div.), certif. denied, 117 N.J. 89, 563 A.2d 847 (1989); Deskovick v. Water Policy & Supply Council, 157 N.J.Super. 89, 384 A.2d 554 (App.Div.), certif. granted, 77 N.J. 482, 391 A.2d 497, certif. dismissed, 78 N.J. 410, 396 A.2d 597 (1978), does not negate the agency's authority in the limited instance involving C1 waters to establish a regulatory safety buffer.
[Ibid.]
We apply this same reasoning here to hold that the WQPA rules are not preempted by the FWPA.

(v)
Appellant also contends that by limiting builders to septic tanks for wastewater disposal, N.J.A.C. 7:15-5.24 will have the unintended effect of actually disturbing more land with the development of large lots with large houses, landscaped property and extensive roadways. Aside from being highly speculative, appellant's argument is fatally flawed because N.J.A.C. 7:15-5.24(a) does not require large lot zoning and allows for "[i]n fill development, revitalization and redevelopment in appropriate locations." 40 N.J.R. 4013, 4014 (July 7, 2008). Additionally, N.J.A.C. 7:15-3.5(b) provides incentives for cluster development via a simplified administrative process.
Equally lacking in merit is appellant's other argument that N.J.A.C. 7:15-5.24 violates the Mount Laurel doctrine. That principle espouses that all municipalities must provide a realistic opportunity for the construction of their fair share of the region's present and prospective need for low-and moderate-income housing. S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mt. Laurel, 67 N.J. 151, 336 A.2d 713, cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975); (Mount Laurel I); S. Burlington Cnty. N.AA.C.P. v. Twp. of Mt. Laurel, 92 N.J. 158, 456 A.2d 390 (1983) (Mt. Laurel II). This obligation also applies to State agencies when the agency has "complete control over the planning and zoning" of land. In re Adoption of N.J.A.C. 19:3, 19:4, 19:5 & 19:6, 393 N.J.Super. 173, 182, 922 A.2d 852 (App.Div.2007), certif. denied, 194 N.J. 267, 944 A.2d 28 (2008). An example of this type of State agency is the Meadowlands Commission. Ibid.
Appellant contends that the Mount Laurel doctrine applies in this case because the DEP is a State agency and the water quality rules regulate land use. Appellant relies on In re Egg Harbor Associates, 94 N.J. 358, 464 A.2d 1115 (1983), for the proposition that the Mount Laurel obligation attaches to DEP land use regulations.
The WQMP Rules, however, are not land use regulations, and the DEP does not have complete control over the planning and zoning of the land to which *112 the WQMP Rules apply. The Rules are general regulations that apply to all environmentally sensitive land. The holding in In re Egg Harbor Associates, supra, does not establish otherwise.
There, the Court found that the DEP "may condition its approval of a proposed development within the coastal zone on the construction of a certain number of low and moderate income housing units," id. at 361, 464 A.2d 1115, because the DEP had the authority to "regulate land use within the coastal zone for the general welfare." Id. at 364, 464 A.2d 1115. The DEP does not exercise similar land use authority in relation to the WQMP Rules. For this reason alone, the Mount Laurel doctrine has no application here.

(vi)
In conclusion, in promulgating the WQMP rules, the DEP struck the proper balance between, on the one hand, a property owner's interest in developing land and, on the other hand, the State's interest in preserving protected species habitat, preserving water quality, protecting the environment, and conserving public sewage resources. As to the latter group of interests, both the WQPA and the WPCA authorize the DEP to set water quality standards and the WQPA also instructs that, in doing so, the DEP consider related environmental, social and land use policies. Thus, the DEP clearly has the authority to promulgate water quality regulations that promote water quality and environmental goals. Embodying the agency decision that structuring sewage lines to limit the density of development in environmentally sensitive areas was the most efficient and beneficial way to address water quality concerns in environmentally sensitive areas, N.J.A.C. 7:15-5.24 represents a valid and reasonable exercise of the DEP's statutory authority.

II.
Appellant challenges as arbitrary and capricious N.J.A.C. 7:15-5.25(e), which sets the maximum nitrate level for septic system discharge, and provides in part:
For areas not covered by (d) above [on sewer service areas], the future wastewater treatment needs of the entire remaining wastewater management planning area shall be evaluated in conformance with the following:
1. Except as provided in (e)2 below [on Highlands preservation areas], in areas proposed to be served by individual subsurface sewage disposal systems [i.e., septic systems] discharging 2,000 gallons per day or less to ground water, the applicant shall determine the development density that can be accommodated in undeveloped and underdeveloped areas that will result in attainment of two mg/L nitrate in the ground water on a HUC 11 basis, as follows. . . .
[N.J.A.C. 7:15-5.25(e).]
The sections that follow provide alternative methods for calculating the nitrate level. N.J.A.C. 7:15-5.25(e)1i to v.
Appellant contends that the two mg/L standard is "excessively stringent" and "effectively increases the minimum" size of lots, "thus reducing the development potential of property." It argues that the DEP should have set the nitrate level for septic system discharge at ten mg/L, which is the drinking water standard. Instead, the DEP set the standard significantly lower without any scientific evidence showing that the lower rate would benefit the environment or the public health. We disagree.
*113 In support of its argument, appellant relies on Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 653, 100 S.Ct. 2844, 2870, 65 L.Ed.2d 1010, 1042 (1980), where the Court struck down a federal work-place regulation that decreased the accepted level of benzene exposure from ten ppm to one ppm because there was no proof that one's risk of developing cancer lessened if the exposure to benzine was less than ten ppm.
Appellant's reliance on this case is misplaced because nitrate levels for drinking water and ground water are different. The DEP based the acceptable nitrate level for septic system discharge on the statewide average level of nitrate in groundwater, which is reasonable because septic system discharge will flow into ground water. Consistent with the principle that groundwater quality should be preserved, the DEP set the nitrate level at an amount consistent with the State average. That the drinking-water level is higher is beside the point.
Appellant criticizes the DEP average as a "theoretical calculation," "not based on existing nitrate levels of any specific groundwater." Further, the DEP holds all septic systems to the two mg/L standard regardless of the nitrate level in the groundwater near the septic system and regardless of whether two mg/L would degrade the surrounding groundwater. Appellant contends that the DEP has failed to explain "how its one-size-fits-all standard . . . [will] `restore and maintain' water quality in areas where ambient nitrate levels are lower then [two] mg/L." Conversely, in areas where nitrate levels are greater than two mg/L, the standard will not restore and maintain water quality.
While appellant correctly notes that the two mg/L standard applies to all septic systems regardless of the nitrate level in the surrounding groundwater, this circumstance does not render the regulation arbitrary and capricious.
"[R]egulations which fall within the scope of the statutorily delegated authority and are not ultra vires on their face," are presumed to be valid. Soc'y for Envt'l Econ. Dev. [v. N.J. Dep't of Envtl. Prot.], 208 N.J.Super. [1,] 4, 504 A.2d 1180 [(App.Div.1985)]; see also N.J. State League of Municipalities [v. Dep't of Cmty. Affairs,] 158 N.J. [211,] 222, 729 A.2d 21 [(1999).] In re Adoption of Amendments to N.J.A.C. 5:93-1.3 and 5:93-5.3, 339 N.J.Super. 371, 383, 772 A.2d 9 (App.Div.2001). The party challenging such action has the burden of overcoming that strong presumption. Med. Soc'y of N.J. v. N.J. Dep't of Law & Pub. Safety, 120 N.J. 18, 25, 575 A.2d 1348 (1990).
Moreover, "courts ordinarily recognize that an agency's specialized expertise renders it particularly well-equipped to understand the issues and enact the appropriate regulations pertaining to the technical matters within its area." In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 330, 807 A.2d 198 (App.Div.2002); see also N.J. State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21. "`If there is any fair argument in support . . . [of the agency's action, it] will not be disturbed unless patently corrupt, arbitrary or illegal.'" N.J. Guild [of Hearing Aid Dispensers v. Long], 75 N.J. [544], 384 A.2d 795 [(1978)] (quoting Flanagan v. Dep't of Civil Serv., 29 N.J. 1, 12, 148 A.2d 14 (1959)).
[In re Stormwater Mgmt. Rules, supra, 384 N.J.Super. at 465-66, 894 A.2d 1241.]
Additionally, a court may remand for an evidentiary hearing if it determines that *114 the record developed before the agency is inadequate to fully address the objector's challenge. In fact, we followed this approach in In re Highlands Water Protection & Planning Act Rules, N.J.A.C. 7:38-1, 401 N.J.Super. 587, 595, 952 A.2d 487 (App.Div.2008), where an objector argued that the DEP's septic density standard for the Highlands was not supported by adequate scientific evidence. We remanded the matter to an administrative law judge for an evidentiary hearing on the scientific basis for the standard. Id. at 596, 952 A.2d 487.
Here, we are satisfied that the record provides adequate evidence and therefore a rational basis for the nitrate standard. The DEP cites numerous studies in support of the standard, and appellant presents no evidence to establish that any of those studies produced incorrect results.
Further, applying the standard to all septic systems simplifies the process for the DEP and property owners. The alternative would require individual standards applicable to the nitrate levels in the groundwater of each property, which would result in additional expensive and time-consuming testing and regulating. Therefore, we defer to the unilateral approach chosen by the DEP to regulating septic system discharge as reasonable.
Appellant contends that the two mg/L average is meaningless because it is "fraught with arbitrary and unsupported assumptions." There is no indication, appellant asserts, that the two wells from which the DEP took readings represented nitrate levels in other parts of the State, and some of the readings dated back to 1978. Further, the DEP removed from the calculation sixty wells located in agricultural areas. Because agricultural areas have higher nitrate levels in the groundwater, excluding readings from these areas resulted in a lower average.
This argument not persuasive. The DEP conducted numerous calculations to determine the average amount of nitrate in groundwater. It removed from some calculations areas that have higher concentrations of nitrate due to man-made sources, like fertilizer. That does not render the calculations meaningless or arbitrary. On the contrary, we find N.J.A.C. 7:15-5.25(e) to be a valid exercise of the DEP's regulatory authority and rationally supported in the evidence.
We have considered appellant's remaining arguments both with respect to N.J.A.C. 7:15-24(b)1 and 2 and N.J.A.C. 7:15-5.25(e), and find them lacking in sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] According to the DEP, when N.J.A.C. 7:15 was amended in 2008, DEP directed applicants and local planning agencies to use GIS coverages provided by the DEP when preparing WMPs. The GIS system is computer-based and uses digital mapping information. Features such as land use and land cover, roads, zoning, threatened and endangered species habitat, streams and wetland coverages are all stored independently as a separate coverage or layer. The GIS system allows the user to select different coverages and layer them over each other to perform land use planning analyses.
[2] According to the DEP, center based development concentrates on localized areas in exchange for additional protection or a reduction in development density in the surrounding area, typically referred to as the environs.
[3] In relevant part, the enabling statute grants the DEP the following powers:

 "Prepare, administer and supervise Statewide, regional and local programs of conservation and environmental protection," N.J.S.A. 13:1D-9f;
 "Encourage, direct and aid in coordinating State, regional and local plans and programs concerning conservation and environmental protection in accordance with a unified Statewide plan[,] . . . giv[ing] due consideration to the development of a comprehensive ecological and environmental plan," N.J.S.A. 13:1D-9g;
 "Administer or supervise programs of conservation and environmental protection," N.J.S.A. 13:1D-9h;
 "Enforce the State air pollution, water pollution, conservation, environmental protection, solid and hazardous waste management laws, rules and regulations," N.J.S.A. 13:1D-9n;
 "Conduct research and implement plans and programs to promote ecosystem-based management," N.J.S.A. 13:1D-9w; and
 Regulate waters and sewage, N.J.S.A. 13:1D-7a and -9k.