NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5141-13T2

DEPARTMENT OF COMMUNITY
AFFAIRS, BUREAU OF ROOMING
AND BOARDING HOUSE STANDARDS,

 Petitioner-Respondent,

v.

HANSEN HOUSE, LLC, THE
HANSEN HOUSE, and THE HANSEN
FOUNDATION, INC.,

 Respondents-Appellants.
_____________________________________________

 Argued September 20, 2016 – Decided August 30, 2017

 Before Judges Messano, Espinosa and Guadagno.

 On appeal from the New Jersey Department of
 Community Affairs, Agency Docket No. RBHS-018-
 09/0601-0058.

 Steven G. Polin (Law Office of Steven G.
 Polin) of the Washington, D.C. bar, admitted
 pro hac vice, argued the cause for appellants
 (Mr. Polin and Nehmad, Perillo & Davis,
 attorneys; Mr. Polin and Michael R. Peacock,
 on the brief).

 Leonard Leicht argued the cause for respondent
 (Morgan, Melhuish, Abrutyn, attorneys; John D.
 North, of counsel and on the brief; Emily A.
 Kaller and Irene Hsieh, on the brief).
PER CURIAM

 The Randy Scarborough Serenity House (RSS House) provides

housing and support services to those recovering from drug and

alcohol addiction. RSS House is owned and operated by Hansen

House, LLC (HHLLC), a limited liability corporation that is a

subsidiary of the Hansen Foundation (the Foundation), a non-profit

organization created to help recovering addicts. Ole Hansen and

Sons, Inc., another affiliated entity, is the mortgagee of the

property.1

 RSS House is a three-story building with eight bedrooms,

housing eight to twelve residents, along with a shared kitchen,

living room and laundry room. The residents pay a security deposit

and monthly rent to HHLLC, and enter into individual leases for

the occupancy of their room and use of the common areas. The

Foundation pays the utilities, real estate taxes and other

operating expenses for the property. There are a limited number

of staff members at RSS House who provide supportive services,

such as driving residents to meetings, assisting in administering

their medication, supervising visitors and facilitating

interaction with other service providers.

1
 Except when distinctions are necessary, we refer to these related
entities collectively as "Hansen House" throughout this opinion.
 2 A-5141-13T2
 Responding to a complaint lodged by the Department of Human

Services, the Department of Community Affairs (DCA) conducted a

field inspection of RSS House. DCA concluded RSS House was a

rooming/boarding house subject to licensure under the provisions

of the Rooming and Boarding House Act of 1979, N.J.S.A. 55:13B-1

to -21 (the Statute). DCA issued a notice of violation and imposed

a $5000 penalty. Hansen House objected and requested a hearing,

which was conducted before an administrative law judge (ALJ) in

the Office of Administrative Law over four non-consecutive days

spanning eight months.

 Hansen House asserted that RSS House operated as a single

housekeeping unit and the relationship among its residents was

akin to a family. Hansen House also argued DCA's enforcement

action violated the federal Fair Housing Act (the FHA), 42 U.S.C.A.

§§ 3601-3619, because DCA refused Hansen House a reasonable

accommodation, but nonetheless accommodated another entity, Oxford

House, which provided similar services in a similar setting to

recovering addicts.

 Before the ALJ issued his initial decision, a member and

former member of RSS House filed suit against DCA in federal

district court alleging various statutory and constitutional

 3 A-5141-13T2
violations that are essentially the same statutory arguments

presented to DCA.2 That action is still pending.

 In his initial decision, the ALJ found it was undisputed that

residents at RSS House received certain assistance from paid staff

members. He also concluded RSS House residents were permitted

under their leases to use, and were using, "keyed door locks" on

their individual rooms.

 The ALJ accepted the testimony of Angelo Mureo, DCA's

Enforcement Field Supervisor, who inspected RSS House. Mureo

described various features that distinguished RSS House from

Oxford House. For example, the charter for the Oxford House entity

prohibited it from owning any residential property and, therefore,

it signed a lease with the property owner; the individual residents

in Oxford House did not sign leases. Additionally, the residents

themselves interviewed applicants and selected their fellow

residents in an Oxford House. Furthermore, there was no paid

staff in an Oxford House, and residents managed their own

collective finances from a single checking account.

 The ALJ also cited the testimony of Michael Briant, DCA's

Supervisor of Enforcement, Bureau of Rooming and Boarding House

Standards (BR&BHS). Briant explained that RSS House was not a

2
 Schoenstein v. Constable, No. 3:13-CV-06803 (JAP), 2014 U.S.
Dist. LEXIS 165508 (D.N.J. Nov. 26, 2014) (the federal suit).

 4 A-5141-13T2
single-family dwelling, i.e. it was not occupied as a "single

housekeeping unit," and therefore it required a license. He

acknowledged that in order to secure the license, Hansen House

needed to install a sprinkler system.

 Briant stated that RSS House might be eligible for exemption

from code requirements applicable to rooming and boarding houses

if the residents were self-governing and autonomously operated RSS

House. Briant claimed that creating a new exemption for RSS House

would run contrary to the legislative purposes of the Statute,

because DCA would then need to exempt other facilities where the

owner of the property controlled the operation of the "recovery

house."

 The ALJ concluded RSS House operated as an unlicensed boarding

house in violation of the Statute. He explained that DCA had

"allowed one type of sober recovery facility to avoid regulation"

under the Statute, and that was "the Oxford House model." The ALJ

referenced various DCA memoranda, in particular, a 2004 memorandum

by Raymond A. Samatovicz, DCA's former Director of the Bureau of

Rooming & Boarding House Standards (the Samatovicz Memo), setting

forth key features of the Oxford House program, and approving

exemptions because, as the ALJ summarized, "Oxford House residents

are really operating like a family while [Hansen House] is

exercising the control of a boarding house operator."

 5 A-5141-13T2
 Although the ALJ found it "difficult to see how fire safety

[was] an issue" at RSS House, he rejected Hansen House's argument

that the FHA required DCA to "carve out a new waiver," noting

"where a regulation is not using some other requirement as a proxy

for disability, the fact that it happens to cost a particular

entity more than another entity does not rise to discrimination."

The ALJ affirmed DCA's decision and imposed a $5000 penalty on

Hansen House.

 The DCA Commissioner adopted the ALJ's initial decision and

filed the agency's final decision in May 2014. Hansen House

appealed. In October 2014, we granted Hansen House's request to

stay all proceedings based on the pending federal lawsuit. When

that stay expired, and after the district court judge denied DCA's

motion to dismiss the federal suit, Hansen House again sought a

stay of the enforcement of DCA's penalty, which we denied by order

in February 2015. We heard argument in September 2016, at which

time the parties acknowledged the pending federal suit presented

the same issues regarding DCA's alleged failure to reasonably

accommodate RSS under the FHA. On January 30, 2017, we sua sponte

ordered the parties to appear before Judge Joseph A. Lisa (Ret.),

as part of the Civil Appeals Settlement Program. At the time, we

noted the federal lawsuit was continuing and presented "issues

that are inextricably related to the issues raised on appeal."

 6 A-5141-13T2
The parties apparently could not reach consensus regarding any

further stay of this appeal. We therefore turn to the arguments

raised by Hansen House.

 Hansen House argues the FHA applies to RSS House, which serves

individuals with a "handicap," 42 U.S.C.A. 3602(h); Hansen House

made a reasonable request for an accommodation from DCA that was

necessary to the residents' continued recovery; DCA had both the

duty and authority to grant the accommodation requested; yet, it

failed to do so in violation of the FHA. Additionally, Hansen

House contends DCA violated the Administrative Procedure Act

(APA), N.J.S.A. 52:14B-1 to -15, by adopting the standards set out

in the Samatovicz memorandum, and not granting exemptions unless

an organization fit the "Oxford model."

 We have considered these arguments, in light of the record

and applicable legal standards. We affirm, but also remand the

matter to DCA for further proceedings consistent with this opinion.

 I.

 "The scope of appellate review of a final agency decision is

limited." In re Carter, 191 N.J. 474, 482 (2007) (citing Aqua

Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 15-16

(2006)). "An appellate court affords a 'strong presumption of

reasonableness' to an administrative agency's exercise of its

statutorily delegated responsibilities." Lavezzi v. State, 219

 7 A-5141-13T2
N.J. 163, 171 (2014) (quoting City of Newark v. Natural Res.

Council, Dep't of Envtl. Prot., 82 N.J. 530, 539, cert. denied,

449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980)).

 An agency decision should not be overturned unless there is

"a showing that it was arbitrary, capricious or unreasonable, or

that it lacked fair support in the evidence." In re Carter, supra,

191 N.J. at 482.

 To determine whether an agency decision "is
 arbitrary, capricious or unreasonable," an
 appellate court must determine

 (1) whether the agency's action
 violates express or implied
 legislative policies, that is, did
 the agency follow the law; (2)
 whether the record contains
 substantial evidence to support the
 findings on which the agency based
 its action; and (3) whether in
 applying the legislative policies
 to the facts, the agency clearly
 erred in reaching a conclusion that
 could not reasonably have been made
 on a showing of the relevant
 factors.

 [Lavezzi, supra, 219 N.J. at 171-72 (quoting
 In re Stallworth, 208 N.J. 182, 194 (2011)).]

 We "defer to an agency's expertise and superior knowledge of

a particular field." Greenwood v. State Police Training Ctr., 127

N.J. 500, 513 (1992). Furthermore, we "presume that the

regulations they pass are valid because 'agencies have the

specialized expertise necessary to enact regulations dealing with

 8 A-5141-13T2
technical matters and are "particularly well equipped to read and

understand the massive documents and to evaluate the factual and

technical issues that . . . rulemaking would invite."'" In re

Adoption of N.J.A.C. 7:15-5.24(b), 420 N.J. Super. 552, 564 (App.

Div.) (quoting N.J. State League of Municipalities v. Dep't of

Cmty. Affairs, 158 N.J. 211, 222 (1999)), certif. denied, 208 N.J.

597 (2011). However, we are not "bound by [an] agency's

interpretation of a statute or its determination of a strictly

legal issue." Norfolk S. Ry. Co. v. Intermodal Props., LLC, 215

N.J. 142, 165 (2013)).

 The Statute is "remedial legislation . . . necessary to

provide for the health, safety and welfare of all those who reside

in rooming and boarding houses in this State." N.J.S.A. 55:13B-

2. The Statute defines a "rooming house" as "a boarding house

wherein no personal or financial services are provided to the

residents." N.J.S.A. 55:13B-3(h). A "boarding house," in turn,

is defined as "any building . . . which contains two or more units

of dwelling space arranged or intended for single room occupancy

. . . and wherein personal or financial services are provided to

the residents." N.J.S.A. 55:13B-3(a).

 Regulations promulgated under the Statute ensure "the

protection and care of the residents of rooming houses, [and]

boarding houses." N.J.S.A. 55:13B-2; see also N.J.A.C. 5:27-1.1

 9 A-5141-13T2
to -14.1 ("Regulations Governing Rooming and Boarding Houses").

Those regulations require every rooming and boarding house to be

licensed, N.J.A.C. 5:27-1.6(a), and impose general requirements

for every building in which a rooming or boarding house operates.

N.J.A.C. 5:27-4.1 to -4.10.

 DCA argues, and we agree, that RSS House fits the statutory

definition of a "boarding house." Hansen House may have asserted

otherwise before the ALJ, but it makes no argument on appeal to

the contrary. An issue not briefed is deemed waived on appeal.

N.J. Dept. of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501,

505-06 n.2 (App. Div.), certif. denied, 222 N.J. 17 (2015). As a

result, we conclude that RSS House was a boarding house that

operated without a license, and the Commissioner had the authority

to impose sanctions.

 Instead, Hansen House contends the ALJ, and DCA in turn,

misapplied precedent developed under the FHA, which requires a

reasonable accommodation from the strictures of the Statute and

regulations based upon an individualized assessment. We disagree.

 The FHA is broadly construed to effect the goal of eradicating

discrimination in housing based upon handicap status. Helen L.

v. DiDario, 46 F.3d 325, 333 n.14 (3d Cir.), cert. denied, 516

U.S. 813, 133 L. Ed. 2d 26, 116 S. Ct. 64 (1995). Under the FHA,

"a refusal to make reasonable accommodations in rules, policies,

 10 A-5141-13T2
practices, or services, when such accommodations may be necessary

to afford [a handicapped] person equal opportunity to use and

enjoy a dwelling," constitutes illicit "discrimination." 42

[U.S.C.A.] §3604(f)(3)(B). The Third Circuit has said that "the

plain language of the statute requires [a court] to focus on all

three factors, i.e., whether the requested accommodation is '(1)

reasonable and (2) necessary to (3) afford handicapped persons an

equal opportunity to use and enjoy housing.'" Lapid-Laurel v.

Zoning Bd. of Adjustment, 284 F.3d 442, 457 (3d Cir. 2002) (quoting

Bryant Woods Inn, Inc. v. Howard Cty., 124 F.3d 597, 603 (4th Cir.

1997)). See id. at 459 ("[T]he initial burden is on the plaintiff

to demonstrate that the accommodations that it requested are

'necessary to afford [handicapped] persons an equal opportunity

to use and enjoy a dwelling,' 42 U.S.C.A. § 3604(f)(3)(B), at

which point the burden shifts to the defendant to show that the

requested accommodations are unreasonable.").

 It is not disputed that the residents of RSS House suffer

from a handicap as defined by the FHA. 42 U.S.C.A. §3602(h); see

also 24 C.F.R. 100.201(a)(2); see also Oxford House, Inc. v. Twp.

of Cherry Hill, 799 F. Supp. 450, 459 (D.N.J. 1992) (holding

recovering alcoholics and substance abusers are handicapped for

purposes of the FHA); Cherry Hill Twp. v. Oxford House, Inc., 263

 11 A-5141-13T2
N.J. Super. 25, 52 (App. Div. 1993) ("[A]lcholism is a handicap

covered by the New Jersey Law Against Discrimination . . . .").

 Hansen House argues its request for an exemption from the

Statute and its regulations is reasonable. For a requested

accommodation to be "reasonable" under the FHA, it must be shown

that the accommodation does not (1) impose undue financial or

administrative burdens on the regulatory agency; (2) impose an

"undue hardship" on DCA; or (3) require a fundamental alteration

in the nature of the regulatory program. Lapid-Laurel, supra, 284

F.3d at 462.

 Here, the ALJ specifically noted there were no particular

fire safety concerns at RSS House, implying a core public purpose

of the Statute — "protecting the health, safety and welfare of the

residents of rooming houses [and] boarding houses" — was not

compromised by the request for an exemption. Further, although

the DCA raised the specter of having to grant numerous exemptions

to programs similar to RSS House if it granted an exemption in

this case, the ALJ did not make any specific finding in that

regard. Moreover, DCA granted an exemption to Oxford House and,

the record reflects, other recovery programs.3 As a result, at

least on the record before us, it is difficult to conclude the

3
 A DCA memo in the record reflects that the exemption applied to
Oxford House also applied to two other facilities, "Last Chance
Recovery and Half Measures."
 12 A-5141-13T2
accommodation, i.e., exemption, would significantly alter the

regulatory scheme any more than it already has been altered.

 However, Hansen House failed to demonstrate that exemption

from the Statute and its regulations was "necessary to afford [the

residents of RSS House an] equal opportunity to use and enjoy a

dwelling." 42 U.S.C.A. § 3604(f)(3)(B). As the Third Circuit

said in Lapid-Laurel, supra, 284 F.3d at 459, "The key . . . is

that the plaintiff in an [FHA] reasonable accommodations case must

establish a nexus between the accommodations that he or she is

requesting, and their necessity for providing handicapped

individuals with an 'equal opportunity' to use and enjoy housing."

(Emphasis added). "The 'necessary' element . . . requires . . .

a direct linkage between the proposed accommodation and the 'equal

opportunity' to be provided to the handicapped person." Bryant

Woods, supra, 124 F.3d at 604.

 The facts in Lapid-Laurel, supra, are demonstrative of this

"necessary" nexus. There, the plaintiff argued a use variance was

necessary to achieve equal opportunity for elderly handicapped

individuals to live in a residential area of Scotch Plains, which

zoning ordinance did not permit healthcare facilities. 284 F.3d

at 460. Plaintiff produced evidence that the elderly handicapped

who need skilled nursing care usually are unable to live in their

own homes and must live in an institutional setting in order to

 13 A-5141-13T2
receive the assistance and health care they need. Ibid. Plaintiff

proffered expert testimony indicating that one of the objectives

of the proposed facility was to allow the elderly to live in a

predominately single-family residential zone to normalize their

care. Ibid.

 Here, Hansen House contends that residents of RSS House will

be denied the equal opportunity to live there unless DCA grants

an exemption. However, the Statute and applicable regulations

requiring licensure do not prohibit Hansen House from operating

RSS House. There was, for example, no proof at the hearing

regarding the financial impact upon the facility if it had to

secure the license. While licensure may require renovations,

Hansen House has not demonstrated that the financial burden of

compliance would undermine RSS House's therapeutic operations or

cause the facility to close.

 We also note that the Statute's regulations specifically

permit requests for "exception[s] waiving, modifying or postponing

the application of any regulation to any owner's rooming or

boarding house." N.J.A.C. 5:27-1.9(a). However, Hansen House did

not request an exception as required by the regulations. N.J.A.C.

5:27-1.9(c). Nor did it seek an exception from a specific

requirement imposed by regulation upon all rooming and boarding

houses. For example, Hansen House never sought an exception from

 14 A-5141-13T2
Subchapter 4's regulations regarding general building

requirements. N.J.A.C. 5:27-4.1 to - 4.10. Instead, Hansen House

defended against the proposed penalty by claiming it was not

subject to the statutory and regulatory regime at all, or that its

exemption from that regime was a required reasonable accommodation

under the FHA.

 As a result, we conclude that RSS House was subject to the

Statute and its implementing regulations. We therefore affirm

DCA's final agency decision.

 II.

 Hansen House argues DCA used the factors set forth in the

Samatovicz Memorandum (the Memo) as a rule of general application

to all group recovery homes, while, at the same time, never going

through required agency rulemaking. See Metromedia, Inc. v. Dir.,

Div. of Taxation, 97 N.J. 313, 331-32 (1984). DCA argues the Memo

is exempt from rulemaking because it is an "intra-agency

statement." The governing provision of the APA is N.J.S.A. 52:14B-

2(e), which provides:

 "Administrative rule" or "rule," when not
 otherwise modified, means each agency
 statement of general applicability and
 continuing effect that implements or
 interprets law or policy, or describes the
 organization, procedure or practice
 requirements of any agency. The term includes
 the amendment or repeal of any rule, but does
 not include: (1) statements concerning the
 internal management or discipline of any
 15 A-5141-13T2
 agency; (2) intraagency and interagency
 statements; and (3) agency decisions and
 findings in contested cases.

 [Emphasis added.]

The APA does not define what an "intraagency statement" is,

however, the Court defined an "intra-agency statement as (1) a

communication between agency members that (2) does not have a

substantial impact on (3) the rights or legitimate interests of

the regulated public." Woodland Private Study Grp. v. State, 109

N.J. 62, 75 (1987). We have held that

 an agency order will be deemed an exempt
 intra-agency statement to the extent (1) it
 is intended to govern the conduct of agency
 employees, as opposed to members of the
 regulated public; (2) any impact on the
 regulated public is incidental or
 unsubstantial; and (3) that impact is on
 interests or rights that do not rise to a level
 needing the protection afforded by the APA
 rule-making procedures.

 [N.J. Builders Ass'n v. N.J. Dep't of Envtl.
 Prot., 306 N.J. Super. 93, 102 (App. Div.
 1997).]

 The Memo, directed to BR&BHS staff, listed seventeen

informational items obtained from Oxford House's "Mission

Statement." However, attached to the Memo was a "Notice of Bureau

Decision," regarding an Oxford House property in Plainfield. In

that decision, DCA cites four particular reasons why it deemed

Oxford House was not a boarding or rooming house subject to the

Statute. Those factors, discussed in the testimony we cited above,
 16 A-5141-13T2
involve the governance and financial aspects of the facility, and

its legal relationship with the property owner. The Memo instructs

BR&BHS staff that the decision applies to not only Oxford House,

but also two other recovery facilities.

 The record also includes two bulletins issued by DCA's

Division of Fire Safety and Division of Codes and Standards. Both

discuss application of the FHA to Oxford House properties and

"Oxford House-like" properties. Each provides guidance for DCA

and municipalities to follow on a case-specific basis.

 Here, we accept DCA's assertion that the Memo, and its

attached final agency decision, were initially "intended to govern

the conduct of agency employees, as opposed to members of the

regulated public." Ibid. However, it is quite clear from the

record before us that DCA has endorsed the factors listed in the

Oxford House decision attached to the Memo, as those it generally

applies to every recovery house.

 Indeed, the record is replete with references to Oxford House

or Oxford House-like facilities, and that DCA's agents and

officials measured Hansen House's legal position against the

factors listed in the Memo and decision. The testimony was

essentially undisputed that DCA told Hansen House's

representatives it would exempt the property if it adopted the

Oxford House model. In other words, this is not like the record

 17 A-5141-13T2
in Builder's Association, supra, 306 N.J. Super. at 103, where we

found the record failed to demonstrate the challenged intra-agency

order was used "as a dispositive basis for specific applications."

The Memo and its attached decision now seemingly govern "the

conduct of . . . members of the regulated public." Id. at 102;

see also Woodland Private Study Grp., supra, 109 N.J. at 73-76

(acknowledging that interagency memo originally directed to agency

members had significant impact on regulated parties and required

public notice and hearing).

 Based on the record before us, we have no way of discerning

whether this impact on recovery houses is "incidental or

unsubstantial," or if it impacts "interests or rights that do not

rise to a level needing the protection afforded by the APA rule-

making procedures." Builder's Ass'n, supra, 306 N.J. Super. at

102. We can state with certainty that Hansen House was not

afforded a case-specific evaluation of whether it should be exempt

from the Statute. In part, that was due to the procedural aspects

we noted above.

 We therefore remand the matter to DCA for further proceedings,

the focus of which should be Hansen House's specific request for

"an exception waiving, modifying or postponing the application of

any regulation," including the regulation defining a boarding

house, pursuant to N.J.A.C. 5:27-1.9(a). In this regard, the

 18 A-5141-13T2
parties are free to supplement the record as appropriate. We do

not foreclose consideration of additional evidence regarding the

impact of the Memo on DCA's consideration of other requests for

exemption.

 Affirmed. Remanded for further proceedings consistent with

this opinion. We do not retain jurisdiction.

 19 A-5141-13T2